PAUL A. BONIN, Judge.
 

 |2Karlton Kirksey and Kirksey Enterprises, Inc. (KEI) appeal a judgment rendered
 
 in solido
 
 against them and in favor
 
 *398
 
 of the New Orleans Jazz and Heritage Foundation, Inc. (the Foundation). Because of our legal review of the contracts involved in this matter, we reverse the trial court’s judgment insofar as it condemned Mr. Kirksey personally to pay any amount and we amend the judgment to reduce the amount from $69,902 to $50,902 due by KEI to the Foundation. Our reasons are explained in detail below.
 

 In Part I we discuss the underlying facts and the several contracts at issue. In Part II we address the reasonableness of the conflicting interpretations of the provisions of the contracts. In Part III we examine the breach of KEI of its contract with the Foundation and in Part IV we consider the personal liability of Mr. Kirk-sey. Finally, we address in Part V the inapplicability of solidary liability in this matter.
 

 _ki
 

 This matter involves the proper interpretation of several contracts. A brief introductory summary of the relationships among the contracting parties, of the contracts themselves, and of the conflicting interpretations is helpful to an understanding of our resolution of this controversy.
 

 A
 

 The Foundation is a non-profit corporation, governed by a board of uncompensated volunteers. The Foundation’s board exercises its authority through officers and committees, such as finance and contracts. It had at least one direct employee, an executive director. The primary public mission of the Foundation is the sponsorship and production of the annual New Orleans Jazz and Heritage Festival, colloquially called the Jazz Fest. The Jazz Fest is a seasonal music, heritage, and crafts fair which for years has been held at the New Orleans Fairgrounds, an historic thoroughbred racetrack located in the Gentilly section of New Orleans. The Jazz Fest, held in the daytime during the last week of April and the first week of May, attracts not only locals but people worldwide. Over the last decade the Foundation expanded its offerings to include nighttime music concerts which are presented at venues away from the Fairgrounds, such as the Municipal Auditorium.
 

 In order to manage the Jazz Fest, the Foundation contracts with Festival Productions, Inc.-New Orleans (Festival Productions). During the period relevant to this controversy Festival Productions was the exclusive entity providing | 4 production and management resources to the Foundation and was compensated by the Foundation for its services. One of Festival Productions’ employees was Mr. Kirksey, who was assigned as an associate producer of the daytime Jazz Fest.
 

 Mr. Kirksey was no stranger to the Foundation. For a brief time in 1984, prior to his employment with Festival Productions, he was a direct employee of the Foundation. He was also an entrepreneur of sorts. He incorporated KEI and remained its sole shareholder. Because Mr. Kirksey himself had experience as a concert promoter, including experience in handling ticketing for concerts, KEI had exclusive contractual arrangements for handling ticketing at music venues, including the New Orleans Municipal Auditorium, which contracts were in place before his seasonal employment with Festival Productions.
 

 KEI had an exclusive contract with Ticketmaster
 
 [1]
 
 for tickets sold for events at the Municipal Auditorium. Ticketmas
 
 *399
 
 ter had proprietary rights to software that was apparently desirable to use. Jim Tall-man was the Ticketmaster representative who dealt with Kirksey, whether Kirksey was acting for KEI or for the Foundation. Mr. Tallman had extensive experience in the ticketing aspects of many kinds of events and productions.
 

 B
 

 There are, as earlier noted, several contracts which we are required to examine. Chronologically, the first contract, between KEI and Ticketmaster, a “Licensed User Agreement” from 1995,
 
 [2]
 
 provided that the ticket sales for events at |5venues which were controlled by KEI would be handled exclusively by Ticketmaster. Under the industry custom and practice and as set out in the contract, the event promoter would establish a price for the ticket. KEI would add a “Customer Convenience Charge,” a portion of which would be paid to Ticketmaster for the use of its software. Ticketmaster then would “rebate” a portion of the Convenience Charge back to KEI.
 

 Early in 2000, the Foundation, through its executive director, executed an exclusive contract (entitled “One-Time User Agreement”) with KEI to handle its ticket sales for its Night Concerts at the Municipal Auditorium. Mr. Kirksey signed the contract on behalf of KEI. At that same time Mr. Kirksey, as part of his employment with Festival Productions, was serving as an associate producer for the Jazz Fest. Ticketmaster paid “rebates” to KEI in the amount of $9,368 for the Night Concerts at the Municipal Auditorium that year.
 
 [3]
 

 The following year Ticketmaster entered a contract with the Foundation, entitled “Licensed User Agreement.” This contract was negotiated between Jim Tallman from Ticketmaster and Mr. Kirksey, who, as associate producer for the Jazz Fest, signed on behalf of the Foundation. The Foundation’s contract committee would have approved the contract, but there is no suggestion that any of the officers or board members or committee members had any familiarity with the terms and conditions of this contract. There is no doubt that this contract provided for the Foundation to receive “rebates” from Tiek-etmaster on the Convenience | (¡Charge for the tickets sold for the daytime events held at the Fairgrounds. Ticketmaster remitted payments for three years to the order of the Foundation.
 
 [4]
 
 Because of the execution of three later contracts, it is less clear whether this contract also entitled the Foundation to “rebates” paid out of Convenience Charges for tickets to the Night Concerts.
 

 The Foundation in each of the next three years executed contracts (each entitled “One-Time User Agreement”) -with KEI that provided, just as the contract in 2000 had, that KEI was its exclusive contractor for the sale of tickets to the Night Concerts at the venue controlled by KEI. However, none of these contracts provided for “rebates” on Convenience Charges to the Foundation. Mr. Kirksey signed these contracts on behalf of KEI and the president of Festival Productions signed on be
 
 *400
 
 half of the Foundation as its producer. KEI continued to operate pursuant to its 1995 contract with Ticketmaster. Ticketmaster remitted the “rebate” payments for each of these years directly to the order of KEI for the ticket sales to the Night Concerts, just as it had done in 2000.
 
 [5]
 

 Later in each year, after the Jazz Fest had concluded, KEI would forward an accounting statement to the Foundation. Included on each annual statement from KEI, which was prepared by Mr. Kirksey, was a simple notation (a line item below the total due to NOJHF, designated “Less Ticketmaster Check”) indicating that KEI was deducting as a credit from the net funds owed to the Foundation for that year’s rebate payment from Ticketmaster directly to the Foundation. Not until after the Foundation’s receipt of the 2003 annual accounting statement did anyone 17inquire about the notations. The Foundation’s treasurer met with Mr. Kirksey and queried him about rebates received from Ticketmaster. Mr. Kirksey falsely denied to the treasurer that Ticketmaster had paid
 
 any
 
 rebates to the Foundation.
 

 The Foundation first referred the matter to its public accountants who suggested further inquiry and eventually instituted suit against Mr. Kirksey and KEI. During the discovery stage the Foundation discovered that KEI not only had taken credits for rebates from the daytime Jazz Fest events at the Fairgrounds but had also been directly receiving rebates for the Jazz Fest Night Concerts at his venues. The suit sought to recover from both KEI and Mr. Kirksey an amount equal to the credits he had taken for the daytime events plus an amount equal to the direct rebates received by him. The trial court interpreted the agreement between the Foundation and Ticketmaster as entitling the Foundation to rebates for both the daytime Jazz Fest events as well as the Night Concerts, and it held that Mr. Kirk-sey and KEI were liable
 
 in solido
 
 for these amounts.
 

 C
 

 There are three interpretations of the contracts in effect during the period of time relevant to this dispute. The Foundation, Mr. Tallman from Ticketmaster, and Mr. Kirksey each suggest the following interpretations.
 

 The Foundation asserts that its contract with Ticketmaster is all-inclusive, such that the Foundation alone is entitled to
 
 all
 
 rebates for any tickets sold, whether to the daytime events or the Night Concerts. The Foundation relies on the following provision of its contract with Ticketmaster: “Ticketmaster will pay |HPrincipal [NOJHF] a per ticket rebate on all tickets sold by Ticketmaster.” By this interpretation, which was agreed with and adopted by the trial court, the Foundation, from the time it entered into the Licensed User Agreement with Ticketmaster, was entitled to receive all rebates that Ticketmaster paid for any Jazz Fest event. This includes rebates for the sale of daytime Festival Fairgrounds tickets pursuant to this agreement. This also includes any rebates paid directly to KEI for the sale of Night Concerts Tickets, pursuant to the 1998 KEI/Ticketmaster contract. This interpretation requires that we find, as the trial court did, that the rebate provision in the Foundation/Ticketmaster contract somehow supersedes the KEI/Ticketmaster contract.
 

 
 *401
 
 A second interpretation was offered at trial by Mr. Tallman of Ticketmaster. Mr. Tallman testified without contradiction that the Foundation misunderstands the provision of the Foundation/Ticketmaster contract providing for a “per ticket rebate on all tickets sold by Ticketmaster.” According to Mr. Tallman, the Foundation under their contract was only entitled to the amounts Ticketmaster paid directly to it for the daytime events at the Fairgrounds. Ticketmaster owed the rebates for the Night Concerts to KEI under its contract with Ticketmaster. The trial court did not offer an explanation as to why it disregarded the testimony of a disinterested witness with the most experience in the customary practices of the ticketing business.
 

 Mr. Kirksey had a third view based upon the notion that it was the “ticket box office” which was entitled to collect a Convenience Charge, and in return a rebate, on each ticket sold through his “box office,” whether for the daytime events or the Night Concerts. Mr. Kirksey did not explain why, if his view of the 19arrangements was that he was entitled to all the rebates, he falsely reported to the treasurer that no rebates had been paid.
 

 For the years 2001-2003 the trial court accepted the Foundation’s view that it alone was entitled to all rebates paid by Ticketmaster for all Jazz Fest events and concerts. We review the correctness of that finding.
 

 II
 

 Generally, a contract, subject to interpretation on the four corners of the instrument without the necessity of extrinsic evidence, is interpreted as a matter of law.
 
 Bartlett Constr. Co., Inc. v. St. Bernard Parish Council,
 
 99-1186, p. 6 (La.App. 4 Cir. 5/31/00), 763 So.2d 94, 98. The appellate standard of review with regard to contractual interpretations is as follows:
 

 Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is whether the trial court was legally correct or legally incorrect.
 

 Clinkscales v. Columns Rehabilitation and Retirement Center,
 
 08-1312, p. 3 (La.App. 3 Cir. 4/01/09), 6 So.3d 1033, 1035-1036.
 

 When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. A provision in a contract susceptible of different meanings must be interpreted with a meaning that renders it effective and not one that renders it ineffective. La. C.C. art. 2049. Furthermore, each provision in a contract must be interpreted in light of the other provisions so that each is given the | ^meaning suggested by the contract as a whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053.
 

 If, after examining the four corners of a contract, the contract is ambiguous, the agreement shall be construed according to the intent of the parties, which is to be inferred from all of the surrounding circumstances.
 
 Derbes v. GBS Properties,
 
 
 *402
 
 04-1460, p. 5 (La.App. 5 Cir. 4/26/05) 902 So.2d 1109, lili.
 

 The trial court obviously agreed with the Foundation that the Foundation was entitled to receive all rebates paid by Ticketmaster after the year 2000. However, it is difficult to agree with the Foundation’s assertion that this interpretation expresses its contractual intent when the Foundation itself was ignorant of the rebates. The trial testimony of Joan Rhodes reflects this shortcoming in the Foundation’s argument. Ms. Rhodes, a Foundation Board member, was chairperson of the Festival Budget Committee. When asked at trial about the Foundation’s Licensed User Agreement, she said that while she had seen the agreement before, she did not recall ever having occasion to provide it to anyone before. “At the time I was Chairman of the Festival Budget Committee was doing the 2003 event and I became a little more familiar with this arrangement trying to figure out just what the arrangement was and who was responsible for what,” she explained. It was not until nearly two years after the Foundation entered into the Licensed User Agreement with Ticketmaster that the Budget Committee even turned its attention to these rebates. As Ms. Rhodes stated, “Sometime after June 2003 we were trying to untangle what the situation was as to rebates and checks and how credits were taken.” The Foundation has not demonstrated its |uintent to contract for rebates when members of the Budget Committee were unaware that rebates should have even been forthcoming until 2003.
 

 Mr. Tallman’s testimony provided some insight into the standards and practices of the ticketing business. Often helpful in the interpretation of contracts is the concept of “usage,” described as “a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation.” La. C.C. art. 2055. Mr. Tallman explained that, in light of a ticketing industry standard, it is important to determine who has the right to run ticketing operations at a particular venue. Mr. Tallman agreed that the Licensed User Agreement between Ticketmaster and the Foundation provided for rebates, but those rebates were only for sales of tickets to the daytime Festival and not for tickets to the Night Concerts. “The contract is with Ticketmaster and New Orleans Jazz and Heritage Foundation for events that were presented by the Foundation where there was no contract in place at the venue,” Mr. Tallman explained, “If there was a contract in place at the venue and the Foundation presented a concert at that venue, the venue contract would come into play over the Festival contract.” Accordingly, Ticketmaster wrote the rebate checks for all daytime concerts to the order of the Foundation.
 

 However, Mr. Tallman further clarified that rebate payments for all Night Concert tickets were rightfully paid to KEI for the years 2000, 2001, 2002, and 2003. Returning to the industry practice of paying rebates to the venue operator, Mr. Tall-man explained, “Ticketmaster has a contract with Kirksey Enterprises. He was the manager of the Municipal Auditorium and the Theater of Performing Arts for the — he had the contract to run their ticketing operations over that venue.” The fact that KEI was the ticketing operator for the Municipal Auditorium caused Mr. Tallman to conclude that the Night Concert rebates rightfully belong to KEI. “For 112example,” Mr. Tallman said at trial, “if you had a concert at the New Orleans Arena and the Jazz festival had put a show there at the Arena, our contract with the New Orleans Arena would supersede the Jazz fest contract because they are the operator of the Arena, not the Jazz Fest.”
 
 *403
 
 Mr. Tallman’s interpretation provides the most reasonable reading of the Agreements at issue in this matter, allowing them to be read together and rendered effective.
 

 Ill
 

 The following clause, found in the One-Time User Agreements between KEI and the Foundation for ticket sales to the Jazz Fest Night Concerts, forms the basis of KEI’s contractual liability:
 

 SETTLEMENT. KEI shall pay User an amount equal to the gross ticket proceeds collected by KEI, less the amount KEI is entitled to retain pursuant to this Agreement. Such payment shall be made available to User on the second Monday following the performance date.
 

 KEI, by virtue of these One-Time User Agreements, had a clear obligation to accurately account for the proceeds of tickets sold by KEI. By the terms of these Agreements, each year KEI was' “entitled to retain” various costs and percentages of ticket sales,
 
 [6]
 
 but without specifically providing for rebates. Because none of these One-Time User Agreements provided for rebates, rebates could not form any part of the amount that KEI was entitled to retain. KEI had an obligation to properly account to the Foundation in each year’s settlement. Therefore, the trial eourt correctly found that the Foundation is entitled to repayment of the rebates on the daytime Jazz Fest events improperly accounted for by KEI in the amount of $50, 902.
 

 _biv
 

 We now address the trial court’s decision that Mr. Kirksey is personally liable to the Foundation for the repayment of the rebates. Mr. Kirksey relies upon the general rule that ordinarily a shareholder, officer, or employee of a corporation is not hable for the conventional or legal obligations of a corporation.
 
 See
 
 La. R.S. 12:93 B (“A shareholder of a corporation organized after January 1, 1929, shall not be liable personally for any debt or liability of the corporation”);
 
 Nicholson Management & Consultants, Inc. v. Bergman,
 
 96-0557, 96-0558 (La.App. 4 Cir. 9/25/96) 681 So.2d 471, 477. Louisiana courts hesitate to hold a shareholder, officer or director personally liable for a corporate obligation, and this is especially true when the parties contract with each other as corporations.
 
 Lone Star Industries v. American Chemical,
 
 461 So.2d 1063, 1067 (La.App. 4th Cir.1984). The Foundation, of course, bears the burden of establishing the personal liability of Mr. Kirksey.
 
 See Bricks Unlimited, Inc. v. Lemoine Homes, Inc.,
 
 380 So.2d 714, 715 (La.App. 4th Cir.1980). We, therefore, consider below each theory proposed by the Foundation and the facts which might support the theory.
 

 A
 

 The Foundation first seeks affirmation of the trial court’s finding that Mr. Kirksey owed, and breached, a fiduciary duty of loyalty to the Foundation. The trial court held that Mr. Kirksey, when he signed the 2000 agreement on behalf of the Foundation and failed to disclose KEI’s prior contractual arrangement with Ticketmaster, breached a duty that he owed to the Foundation. The trial court held:
 

 ... KEI was entitled to the 2000 rebate revenue and the Foundation was entitled to the 2002, 2003, and 2004 |14rebate
 
 *404
 
 revenue. Mr. Kirksey signed the December 2000 contract in his individual capacity (as an agent for the Foundation) and not as the sole shareholder of KEI. Thus he is jointly liable with KEI for the rebate revenue wrongfully converted.
 

 “As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties.”
 
 Omega Center for Pain Management, L.L.C. v. Omega Institute of Health, Inc.,
 
 07-558, p. 5 (La.App. 5 Cir. 12/27/07), 975 So.2d 48, 51. The word “fiduciary,” as a noun, means one who holds a thing in trust for another, a trustee; a person holding the character analogous to that of a trustee, with respect to the trust and confidence involved in it and the scrupulous good faith and candor which it requires; a person having a duty, created by his undertaking.
 
 State v. Hagerty,
 
 251 La. 477, 205 So.2d 369, 374 (1968). The Uniform Fiduciaries Law, La. R.S. 9:3801(2) defines “fiduciary”:
 

 “Fiduciary” includes a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other persons acting in fiduciary capacity for any person, trust or estate.
 

 One is said to act in a “fiduciary capacity,” when the business , which he transacts, or the money or property he handles, is not his own or for his benefit, but for the benefit of another person, as to whom he stands in relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.
 
 Hagerty, supra
 
 at 374-375.
 

 The Foundation asserts that Kirk-sey clearly breached a fiduciary duty, as an “employee” of the Foundation, due to the fact that he was associate producer for the Festival when he signed the Licensed User Agreement with Ticketmaster on behalf of the Foundation. The Foundation argues that Kirkse/s breach occurred | iawhen he failed, upon signing this Agreement, to disclose to the Foundation that he had a pre-existing contract with Ticketmaster in his capacity as the sole shareholder of KEI. The Foundation further emphasizes the portion of the trial court’s Reasons for Judgment that states: “It is reasonable to assume that ... Mr. Kirksey was aware that the existence of this 2000 contract superceded his earlier contracts with Ticketmaster.”
 

 Mr. Kirksey was not a party to the contract between Ticketmaster and the Foundation. We do not find that the act of signing this Agreement on behalf of the Foundation exposed Mr. Kirksey to personal liability. Moreover, and most importantly, this contract was not breached such as to give rise to any liability. Each party to this Agreement performed its obligations thereunder. The Foundation granted Ticketmaster the exclusive right to sell tickets to its Jazz Fest events, and Ticketmaster wrote checks to the Foundation for rebates that Ticketmaster understood were owed to the Foundation under this contract: tickets for the daytime Jazz Fest events. The Foundation has not alleged that Ticketmaster, which is not a party to this lawsuit, breached this Agreement by continuing to pay rebates for the Night Concerts under its long-standing agreement with KEI.
 

 Mr. Kirksey signed this Agreement on behalf of the Foundation as its agent, yet he was actually at that time an employee of Festival Productions, which had independently contracted with the Foundation to produce Jazz Fest. Despite this more tenuous connection, the trial court categorically recognized and imposed on Mr. Kirk-
 

 
 *405
 
 sey an employee’s fiduciary duty of loyalty. Both parties direct our attention to the guidelines enumerated in
 
 Canter v. Koehring,
 
 283 So.2d 716 (La.1973) (superseded by the 1976 amendments to the Worker’s Compensation statute, La. R.S. 23:1032, as stated in
 
 Walls v. American Optical Corp.,
 
 98-0455 (La.⅛¾½9/8/99), 740 So.2d 1262). In
 
 Canter,
 
 the Louisiana Supreme Court set out the following criteria necessary to impose individual liability on an executive officer or employee:
 

 1. The principal or employer owes a duty of care to the third person, breach of which has caused the damage for which recovery is sought
 

 2. This duty is delegated by the principal or employer to the defendant.
 

 3. The defendant officer, agent, or employee has breached this duty though personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances — whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
 

 4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiffs damages. If the defendant’s general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
 

 Canter, supra,
 
 at 721. The record before us does not establish that Mr. Kirksey owed an affirmative duty to disclose his corporation’s prior contractual arrangement with Ticketmaster.
 

 We now address the correctness of the trial court’s finding that the rebates were “wrongfully converted.” The Civil Code itself does not identify causes of action for “conversion.”
 
 Dual Drilling Co. v. Mills Equipment Investments, Inc.,
 
 98-0343, p. 4 (La.12/1/98), 721 So.2d 853, 856. Generally, “conversion consists of an act in derogation of the plaintiffs possessory rights, and any wrongful exercise or assumption of authority over another’s goods, depriving him of the possession, permanently or for an indefinite time, is a conversion.”
 
 Quealy v. Paine, Webber, Jackson & Curtis, Inc.,
 
 475 So.2d 756, 760 (La.1985). Conversion at common law is remedied according to absolute liability, a concept that is in “direct conflict with Article 2315 of the Louisiana Civil Code and the principle that liability for wrongful dispossession rests on fault.”
 
 Dual Dulling, supra,
 
 p. 5, 721 So.2d at 857, n. 3 (quoting from A.N. Yiannopoulos, La. Civ. L. Treatise § 359 at 695). Thus, in Louisiana, tortious activity is only established upon proof of fault under La. C.C. art. 2315.
 
 Id.
 
 at 857. A conversion is committed when any of the following occurs: 1) possession
 
 *406
 
 is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel.
 
 II Fire Records, L.L.C. v. Clouden,
 
 06-0763, p. 12 (La.App. 4 Cir. 1/31/07) 951 So.2d 1272, 1279 (quoting
 
 Dual Drilling, supra,
 
 p. 4, 721 So.2d at 857).
 

 The facts of this case do not support a finding of conversion. Neither Mr. Kirksey nor KEI wrongfully came into possession of any rebates. Mr. Kirksey did not forge any checks or documents, he did not divert money from one place to | ^another, and he did not take money from the Foundation. Under the Agreement in effect between KEI and the Foundation, KEI simply owes the Foundation more money than it has paid. KEI failed to perform satisfactorily under its contract with the Foundation. Accordingly, the Foundation may recover the money for rebates owed to it under the contract, but it has not alleged facts sufficient to support a finding that either KEI or Mr. Kirksey “wrongfully converted” the rebates.
 

 C
 

 Despite the Foundation’s characterization of Mr. Kirksey’s denial of personal liability as patently unsound, we acknowledge that KEI, a corporate entity, is the contractual party in this case, and we therefore carefully review the basis for the trial court’s disregard of the corporate form in reaching its judgment.
 

 The Foundation in its brief describes the actions taken by Mr. Kirksey “on behalf of KEI” as its sole shareholder and officer. Citing the KEI/Ticketmaster Licensed User Agreement of 1995, the 1998 Amendment to that Agreement, the settlement statements to credit rebates paid to Jazz Fest for daytime ticket rebates, and the rebate check deposits from Ticketmaster for Night Concert tickets that “should have been made to NOJHF,” the Foundation seeks to emphasize the actions of Mr. Kirksey as an individual, acting on behalf of his corporation. In further support of Mr. Kirksey’s personal liability, the Foundation cites Mr. Kirksey’s position as Associate Producer for FPI, which had exclusive contractual rights to produce the Festival during the years relevant to this matter. The Foundation, echoing the trial court’s reasoning in holding Mr. Kirksey personally liable, asserts that Mr. Kirksey signed, on behalf of the Foundation, the Licensed User Agreement between Ticketmaster and the Foundation which entitled the Foundation to rebates for all tickets sold by Ticketmaster.
 

 | igThe positive principle of La. R.S. 12:93 B, that a shareholder is not liable for the debts of his corporation, is conceptually founded on the theory that “the corporation is itself considered a juridical entity, possessing its own legal personality, separate and distinct from that of its shareholders.” Wendell H. Holmes and Glenn G. Morris, 8 La. Civ. L. Treatise, Business Organizations, § 32.02. Louisiana law specifically provides that corporations may be formed by one or more persons. La. R.S. 12:21. Indeed, a person may form a corporation for the sole or primary purpose of avoiding personal liability.
 
 Bridges v. Autozone Properties, Inc.,
 
 04-0814, p. 19 (La.3/24/05), 900 So.2d 784, 797. Our court, in
 
 National Surety Corp. v. Pope,
 
 stated:
 

 The very nature and existence of a corporation is, of course, a fiction, but the significance of that fiction is that the liability of its members shall be deter
 
 *407
 
 mined judicially as if that fiction were the truth, and persons who deal with it must understand that this is so.
 

 147 So.2d 239, 240 (La.App. 4th Cir.1962).
 

 Of course, there is an exception in which courts will look beyond the corporate fiction to “pierce the corporate veil” and impose shareholder liability. To pierce the corporate veil or find that a corporation is an alter ego of an individual, the courts traditionally look to five factors that, when considered with the totality of the evidence, indicate that the individual and the corporation were not separate entities:
 

 (1) commingling of corporate and shareholder funds;
 

 (2) failure to follow statutory formalities required for incorporation and for the transaction of corporate affairs;
 

 (3) undercapitalization;
 

 (4) failure to provide separate bank accounts and bookkeeping records; and,
 

 (5) failure to hold regular shareholder or director meetings.
 

 yf Dictoguard, Inc. v. Lopeo,
 
 06-631, pp. 6-7 (La.App. 5 Cir. 12/27/06), 948 So.2d 305, 308. However, Louisiana has a strong policy of favoring the recognition of the corporation’s separate existence, such that “[p]iercing the corporate veil is considered a radical remedy only employed in exceptional circumstances.”
 
 Town of Haynesville, Inc., v. Entergy Corp.,
 
 42,019, p. 10 (La.App. 2 Cir. 5/2/07), 956 So.2d 192, 198. In the absence of particular allegations of shareholder fraud, a plaintiff will bear a heavy burden
 
 [7]
 
 of proving that a shareholder disregarded corporate formalities to the extent that the shareholder and the corporation had become indistinguishable. 8 La. Civ. L. Treatise,
 
 supra; See also, e.g., Manning v. United Medical Corp. of New Orleans,
 
 04-0035, p. 9 (La.App. 4 Cir. 4/20/05), 902 So.2d 406, 412.
 

 The breach of contract in this case arises out of the obligations owed by KEI, a corporation, to the Foundation as part of the One-Time User Agreements confected between them regarding ticket sales for the Jazz Fest Night Concerts. KEI agreed to pay to the Foundation “an amount equal to the gross ticket proceeds collected by KEI, less the amount KEI is entitled to retain pursuant to this Agreement.” Each year, the Agreement entitled KEI to retain various fees and percentages of ticket sales, but did not specifically provide for rebates. If the Foundation was ultimately entitled to receive all rebates under these Agreements, and KEI breached the Agreements by not paying these rebates, the Foundation must seek redress from KEI. The Foundation clearly understood that it was dealing |21with a corporate entity when it entered into these contracts, and the Foundation may not now expect judicial disregard for the corporate fiction.
 

 The trial court did not conduct an inquiry into the veil-piercing factors and the record before us does not justify applying the alter ego theory in imposing personal liability upon Mr. Kirksey. The trial court did not find, nor did the Foundation allege, facts sufficient to subvert the shareholder protections of La. R.S. 12:93 B. As the sole
 
 *408
 
 shareholder of KEI, Mr. Kirksey is not personally liable for the debts of his corporation.
 

 D
 

 In his argument that the Foundation’s claims have prescribed, Mr. Kirksey asserts that the trial court •wrongfully held that he owed a duty to the Foundation, particularly because the trial court failed to specify the nature of that duty. “The nature of a cause of action must be determined before it can be decided which prescriptive term is applicable.”
 
 State of Louisiana, Department of Highways v. City of Pineville,
 
 403 So.2d 49, 54 (La.1981). In ruling on Mr. Kirksey’s Exception of Prescription, the trial court reasoned:
 

 The evidence established that the Foundation first became aware of the diverted rebate revenue in December of 2003 when its auditors reported the discrepancies. This case sounds in both tort (conversion) and contract (breach of fiduciary duty). In either event, suit was timely filed. The Exception of Prescription is overruled.
 

 An action for breach of contract is subject to the ten-year prescriptive period for personal actions.
 
 See
 
 La. C.C. art. 3499;
 
 Babkow v. Morris Bart, P.L.C.,
 
 98-0256, p. 12 (La.App. 4 Cir. 12/16/98) 726 So.2d 423, 429. Having determined that the nature of the Foundation’s cause of action against KEI is contractual, we apply the | ^.relevant ten-year prescriptive period. When suit was filed in 2004, the Foundation’s claim against Mr. Kirksey and KEI for rebates it was owed under the 2001, 2002, and 2003 contracts had not prescribed. Insofar as the trial court’s ruling relates to the Foundation’s contractual claim, the trial judge did not err in overruling the Exception of Prescription.
 

 V
 

 We finally turn to the portion of the trial court judgment that holds Mr. Kirksey “jointly liable with KEI for the rebate revenue wrongfully converted.” La. C.C. art. 2324 states the following precept for civil conspiracy:
 

 A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
 

 The actionable element of a claim of conspiracy pursuant to Article 2324 pertains to loss distribution, not substantive liability.
 
 Crutcher-Tufts Resources, Inc. v. J. David Tufts,
 
 09-1572, p. 4 (La.App. 4 Cir. 4/28/10), 38 So.3d 987 (Bonin, J., concurring). Civil conspiracy is not a substantive tort in Louisiana; the concept is relevant only to the distribution of quantum after liability is determined.
 
 Wooley v. Lucksinger,
 
 06-1140, p. 174 (La.App. 1 Cir. 12/30/08), 14 So.3d 311, 435-436. The actionable element under Article 2324 is the
 
 intentional tort
 
 the conspirators agreed to commit and committed in whole or in part causing plaintiffs injury.
 
 Jefferson v. Lead Industries Ass’n, Inc.,
 
 930 F.Supp. 241, 248 (E.D.La.1996). Because the actionable element of the Foundation’s action against KEI is not an intentional tort but rather contractual in nature, there is no underlying intentional tort that would support a judgment imposing liability upon Mr. Kirksey and KEI
 
 in solido.
 

 I23DECREE
 

 We hereby reverse the judgment of the trial court as to Karlton Kirksey and, accordingly, there is judgment herein in favor of Karlton Kirksey, individually, and against the New Orleans Jazz and Heritage Foundation, Inc., dismissing its suit as to him with prejudice. We hereby further amend the judgment of trial court as to Kirksey Enterprises, Inc., and as
 
 *409
 
 amended affirm, and, accordingly, there is judgment in favor of the New Orleans Jazz and Heritage Foundation, Inc., and against Kirksey Enterprises, Inc., in the full sum of $50, 902, with interest from the date of judicial demand until paid. All costs are taxed to Kirksey Enterprises, Inc.
 
 See
 
 La. C.C.P. art. 2164.
 

 REVERSED IN PART, AMENDED IN PART AND, AS AMENDED, AFFIRMED.
 

 [1]
 

 . The entity with which KEI had a contract is Ticketmaster L.L.C.
 

 [2]
 

 . This contract was subsequently amended in 1998.
 

 [3]
 

 . The Foundation sought to recover in this suit the rebate payment for 2000. The judgment rejected that claim and the Foundation has not assigned as error that ruling against it.
 

 [4]
 

 .The parties at trial stipulated to the rebate amounts paid to the Foundation. The amounts for each year are $16,567 (2001), $19,025 (2002), and $15,310 (2003).
 

 [5]
 

 . The parties at trial stipulated to the rebate amounts paid to KEI for the years 2001 and 2002. The stipulated amounts are $12,399 (2001) and $6,501 (2002). The parties did nol stipulate to an amount for rebates paid to Kirksey for the Night Concerts in 2003, and the trial court judgment did not include an amount from 2003 in its judgment.
 

 [6]
 

 . KEI’s compensation in the One-Time User Agreements varied only marginally over the years in question. Pursuant to these Agreements, KEI was entitled to a surcharge on all tickets, a Set-up Fee of $400 per event, per-hour wages for Box Office Labor, and a small percentage of sales for Phone, Internet, Outlet, Secondary, and Box Office Sales.
 

 [7]
 

 . Professors Holmes and Morris, 8 La. Civ. L. Treatise,
 
 supra,
 
 write that Louisiana courts recognize that "in any ordinary sense
 
 almost all
 
 closely-held small business corporations are operated as the alter ego or instrumentality of their respective shareholders,” and they accordingly note that the veil will not be pierced solely due to the following: that the shareholder owns a majority, most or all of the stock, that the corporation was minimally capitalized, or that the corporation was incorporated by the shareholder for the purpose of avoiding personal liability.