PAUL A. BONIN, Judge.
hThe Proctor’s Landing Property Owners’ Association sought injunctive relief against Leopold Holdings, LLC, the owner of a lot in the Proctor’s Landing subdivision in St. Bernard Parish. The Association contended that the Company was violating two of the subdivision’s building restrictions. The first violation involved the placing, maintaining, and improving of a small storage shed on the Company’s lot; the Association demanded its demolition or removal. The second violation involved the conducting and operating of a business on the Company’s property; the Association demanded that the business be discontinued and prohibited.
The Company argues that a storage shed is not covered by the building restrictions, yet agrees that if it is covered its storage shed constitutes a violation of the building standards and improvements restrictions. But, the Company then contends that because the storage shed was visible and obvious for more than two years before the Association filed its suit, the Association’s suit is prescribed. Its exception of prescription, however, was overruled by the trial court. One basis for the trial court’s decision was that the Company had acknowledged within two years of the first placement of the storage shed the Association’s right to enforce the building restriction and thereby interrupted the applicable two-year prescriptive | ¿period. After a trial on the merits, the trial court incorporated its findings on the prescriptive exception, granted injunctive relief on the shed claim, and ordered that the shed be removed or demolished within sixty days. The Company suspensively appealed from the part of the judgment ordering the shed’s removal. See La. C.C.P. ART. 3601 B.
The Company also contends that the activities it was conducting on or from its exclusively residential-use lot, primarily the leasing of four boat slips and the use of the storage shed’s facilities, did not constitute the carrying-on of a business, which is prohibited by the specified uses allowed for the lot. Finding that the Association did not carry its burden of proof that a business was being conducted on the Company’s lot, the trial court denied injunctive relief. The Association devolutively appealed from that part of the judgment. See First Bank and Trust v. Duwell, 11-0104, p. 3 (La.App. 4 Cir. 5/18/11), 70 So.3d 15, 18.
We agree with the trial court that the Association’s cause of action is not prescribed and affirm the mandatory injunction decreeing the demolition or removal of the storage shed within sixty days of the finality of this judgment. The trial court’s finding that the Company acknowledged *1202 the right of the Association to enforce the building restriction within two years of the construction of the storage shed is neither clearly -wrong nor unreasonable.
The trial court was clearly wrong, however, when it found that the Association did not satisfy its burden to establish that the Company was conducting a business in violation of the subdivision’s use restrictions. Accordingly, we reverse that part of the judgment and remand to the trial court for it to issue an injunction discontinuing the Company’s current use of the lot for business purposes and prohibiting its future use for the carrying-on of a business.
|sWe explain our decision in greater detail below.
I
We begin our discussion with a consideration of the controlling legal principles applicable to building restrictions.
“Building restrictions are charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements.” La. Civil Code ART. 775. “Building restrictions may be established only by juridical act executed by the owner of an immovable or by all the owners of the affected immovable.” La. Civil Code Art. 776. Here, the Proctor’s Landing subdivision, which was established by juridical act, is located in the Shell Beach community in St. Bernard Parish and consists of twenty-six condominium units as well as eighty-two lots on which residential dwellings may be constructed. The Association declared its covenants, restrictions and servitudes and recorded them on August 2, 1995, and amended them thereafter.[1] There is also no dispute that the general plan satisfies the legal requirement that it “must be feasible and capable of being preserved.” La. Civil Code Art. 775.
“Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable.” La. Civil Code Art. 783. “Apart from the rule of strict interpretation, documents establishing building restrictions are subject to the general rules of the Louisiana Civil Code of 1870 governing the interpretation of juridical acts.” La. Civil Code Art. 783 cmt. (c). (See also, generally, La. Civil Code Arts. 2045-2057.) “Words used are to be understood in the common and usual signification.” Id.
14As the general plan is the private law of the parties, when the words of the general plan “are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” See La. Civil Code Art. 2046. If the questioned provision regarding termination of the building restriction is unambiguous, then its interpretation is a question of law and not of fact. See New Orleans Jazz and Heritage Foundation, Inc. v. Kirksey, 09-1433, p. 9 (La.App. 4 Cir. 5/26/10), 40 So.3d 394, 401.
Building restrictions, once established, are terminated as provided by Title V of Book II of the Civil Code.[2] See La. Civil Code Art. 776. Title V provides inter alia that building restrictions “may terminate or be terminated, as provided in the act that establishes them.” La. Civil Code Art. 780.
*1203 More importantly for the purposes of this dispute, a building restriction may be terminated by the effects of liberative prescription. “No action for injunction or for damages on account of the violation of a building restriction may be brought after two years from the commencement of a noticeable violation.” La. Civil Code ÁRT. 781. “After the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated.” Id.
Thus, unless a building restriction has terminated, it “may be enforced by mandatory and prohibitory injunctions without regard to the limitations of Article 3601 of the Code of Civil Procedure.”[3] La. Civil Code Art. 779. That is, the plaintiff need not show that “irreparable injury, loss, or damage may otherwise | ¡¡result” in the absence of the injunctive relief. La. C.C.P. Art. 3601. Moreover, “[bjuilding restrictions may impose on owners of immovables affirmative duties that are reasonable and necessary for the maintenance of the general plan.” La. Civil Code Art. 778. Under this general plan, a lot owner may be required to remove or correct work which does not comply with approved plans and specifications.
The trial court also based its prescription ruling on the observation that the Leopold brothers informed the Association that they had every intention of building a camp on the property, and that these communications served to interrupt the running of prescription under La. Civil Code art. 781. Specifically, La. Civil Code art. 3464 sets out the applicable rule on interruption, and states: “Prescription is interrupted when one acknowledges the right of the person against whom he had commenced to prescribe.” See also Diefenthal v. Longue Vue Management Corp., 561 So.2d 44, 55 (La.1990); Walters v. Besse, 94-67, p. 3 (La.App. 3 Cir. 10/5/94), 643 So.2d 398, 400.
With these general legal precepts before us, we turn in the following Parts to a consideration of the two specific building restrictions in question and their enforceability by the Association.
II
In this Part, we explain why the Association’s action for a mandatory injunction requiring the demolition of the shed is not prescribed.
As stated earlier, the Company argued that the building restrictions do not control an accessory building, such as the storage shed in this matter. We would agree if the shed in this case were an accessory building. But it is not. It is the sole, principal building on the site, and, by the time of trial, it was obvious that the | (¡Company had no realizable plan for the construction of a required residence to which its shed would be accessory. Thus, at the outset, we conclude that the trial judge was not clearly wrong after conducting a trial on the merits when it concluded that this storage shed was governed by the building restrictions. And the Company agrees that, if the building restrictions apply to and govern the storage shed on its lot, the shed violates the specific building standard required by the general plan. But the Company argues that the restriction is no longer enforceable because it has *1204 been terminated by the two-year liberative prescriptive period.
In order to fully consider the Company’s argument on prescription, we first describe the placement and subsequent improvements to the shed and then describe the interactions and exchanges between the Company and the Association. We finally conclude that the trial judge’s finding that the restriction has not terminated by prescription is not clearly wrong and is reasonable. Therefore, the restriction is properly enforced by a mandatory injunction requiring demolition of the shed.
A
Proctor’s Landing Subdivision is designed as a restricted residential neighborhood in the Shell Beach community. Except for a very few, the lots are available only for single-family houses or camps. The Company acquired Lot 16A in the subdivision subject, of course, to the existing building restrictions. Lot 16A is a waterfront lot and is suitable for boat storage and launching for sport fishing.
In April 2007, the Company purchased a pre-fabrieated storage shed from Home Depot and had it delivered to its lot. The shed is less than 1,000 square feet and cost about $3,400. Initially, the shed was placed on a twenty-four inch high cinder-block foundation with three steps and with no handrails. Attached to the top |7of the shed were 2x4 strips of lumber from which wire cables anchored the shed to the ground. Inside the shed was an ice machine. A permanent pole provided electricity to the property. The Company never applied for a building permit from the parish for the initial installation.
In 2008, Hurricane Gustav damaged the shed by flooding it with five feet of water and shifting it off its foundation. Subsequently, the Company hired a contractor to replace the cinder blocks with sunken pilings, raise the structure forty-eight inches off the ground, reset the shed on the pilings, and install heavier cables and metal banding. The construction company built two new set of stairs with railings and landings, one on each end of the shed. The shed’s electrical system was rewired. The post-hurricane repairs cost more than the initial cost of the building and were completed by the end of 2008.
The Association did not file its suit until July 15, 2009.
One building restriction was that no new construction or improvements could be undertaken on the lot unless reviewed and improved by the Association before obtaining a parish building permit. Another restriction was that the minimum area requirements for residential structures shall be one thousand (1000) square feet of living area, including screened porches. Even though the shed was never intended to be a dwelling, there is no doubt that the Company failed to obtain authorization for its placement on the property or for the post-Gustav improvements.
B
The Association requested the Company and its members, who are the brothers Ryan and Regan Leopold, as well as several other property owners in the subdivision, to move small sheds off otherwise vacant lots. In 2009, former Board | ^President Pat Pescay asked the Company both verbally and in writing to move the shed by January 2009. At trial, Mr. Pes-cay explained that the Association had circulated a letter among the property owners informing them that post-Katrina sheds had to be removed from Proctor’s Landing property by January of 2009.
Additionally, board member Ted Kam-pen, who is a property owner in the subdivision, asked the Company to move the shed in the wake of Hurricane Gustav. Kampen further noted that the present *1205 lawsuit was filed within two years of the letters referred to by Mr. Pescay.
Significantly, the Leopold brothers as the Company’s representatives acknowledged to Association representatives and neighbors that they planned to build a permanent camp when they could afford to do so. For example, Regan Leopold in a March 12, 2009, e-mail to Mr. Pescay discussed plans to develop the lot. He noted that he and his brother had planned to build a “large, beautiful home” on the property, but that their plans were derailed by the 2008 financial crisis. Regan also expressed hope that he and his brother would soon get back on course towards building a camp.
Further, Larry Caldarera, a former Proctor’s Landing property owner and Treasurer for the Association, testified on cross-examination about the Company’s representations to the Board of Directors. Specifically, Caldarera stated that the Leopold brothers had told him that the shed was temporary. Caldarera also testified that he spoke with the Leopold brothers in the spring of 2009, and that they told him that they did not intend to build a camp on their property because of economic difficulties. The Leopolds further told Calda-rera that they had a camp in nearby Reg-gio, Louisiana, and that they no longer needed to have a camp on their 19Proctor’s Landing lot. Caldarera subsequently concluded that the Company did not intend to move the shed.
The Association also elicited similar testimony from Ted Kampen, who testified that he also recalled hearing the Leopold brothers make similar assertions regarding its intentions. Specifically, Kampen testified that he recalled hearing the Leo-polds state at a meeting that they intended to build on the property, but they were on hard times. Kampen accepted the Leo-polds’ assertions, noting that “the general consensus always was people had these things during construction.” Later, the trial judge asked several follow-up questions of Kampen regarding his recollections of the Leopolds’ intentions. Kampen stated that his recollections were based on his direct observations of the Leopolds at a general membership meeting.
Thus, the evidence in the record indicates that the Association properly protested the presence of the Company’s shed on Lot 16A, that the Leopold brothers’ recurring assurances in response to the Association’s requests constitute acknowledgment sufficient to interrupt prescription, and that the Association filed suit within two years of the Leopold’s assurances. Accordingly, we conclude that it was reasonable, based on the testimony and evidence, for the trial court to find that the Association’s suit was not prescribed. Therefore, we affirm the trial court’s denial of the defendant’s exception of prescription.
C
An exception of prescription is a peremptory exception, which a defendant may raise at any time prior to the matter’s submission after trial. La. C.C.P. ARTS. 927 and 928(B). Evidence may be introduced at the trial of all peremptory exceptions, except the objection of no cause of action. La. C.C.P. ART. 931. The trial |incourt is not bound to accept as true the allegations of plaintiffs petition in its trial of the peremptory exception. Bowers v. Orleans Parish School Bd., 95-2530 (La.App. 4 Cir. 5/29/96), 694 So.2d 967, 972. When evidence is introduced and evaluated at the trial of a peremptory exception, an appellate court must review the entire record to determine whether the trial court manifestly erred with its factual conclusions. Id.; Davis v. Hibernia Nat. Bank, 98-1164 (La.App. 4 Cir. 2/24/99), 732 So.2d 61, 63.
*1206 The standard of review of a trial court’s finding of facts supporting prescription is that the appellate court should not disturb the finding of the trial court unless it is clearly wrong. In re Medical Review Proceedings of Ivon, 01-1296 (La.App. 4 Cir. 3/13/02), 813 So.2d 532, 536. In reviewing a peremptory exception of prescription, an appellate court will review the entire record to determine whether the trial court’s finding of fact was manifestly erroneous. Board of Com’rs v. Estate of Smith, 03-1949 (La.App. 4 Cir. 9/2/04), 881 So.2d 811, 815. Further, the standard controlling the review of a peremptory exception of prescription requires that this Court strictly construe the statutes against prescription and in favor of the claim that is said to be extinguished. Id.
Ill
In this Part, we consider whether the specified use restriction in the Act is unambiguous and then describe the activities in which the Company engages. We then explain that we agree with the trial judge that as a matter of law the specified use restriction is unambiguous and enforceable, but find that the trial judge was clearly wrong in finding that those activities did not violate the specific restriction. We conclude this Part with remand instructions to the trial court to issue an appropriate prohibitory injunction.
JllA
The focal provision of the covenant is in Article VII:
7.2: Each lot ... deemed as a residential Lot, shall be used for residential purposes only, and no trade or business of any kind may be carried on therein ... No more than one (1) dwelling shall be located on any herein deemed residential Lot, or combination of Lots. The use of a portion of a dwelling as an office by an owner shall not be considered a violation of this covenant if such use does not create regular customer, client, of [sic] employee traffic. The use of a dwelling or portion thereof for business meetings, entertainment, or the enjoyment or business of the owner’s employees, trustees, agents, clients, or customers shall not be considered a violation of this covenant if such use does not create regular customer, client or employee traffic.
In the trial court, the Company argued that the foregoing language is ambiguous because the covenant does not define “business.” The Company has not pressed this argument in response to the Association’s assignment of error. Nevertheless, an examination of the parties’ arguments to the trial court indicates that the ambiguity of the phrase was less at issue than was the scope of its sweep. The applicable covenant articles indicate that the Company’s lot was intended for residential use only, and that business activity of any kind was prohibited. At issue, then, was whether the Company’s use of its lot could be classified as trade or business of any kind. Accordingly, we must first examine the phrase within the context of the covenant before we can ascertain whether the trial court’s ruling was manifestly erroneous.
Building restrictions are to be strictly construed. Cashio v. Shoriak, 481 So.2d 1013 (La.1986). The intent of building restrictions must be ascertained according to the words therein, their usual meaning and with consideration of the 112context of the words in the document. Payne v. Melancon, 34,667 (La.App. 2 Cir. 9/17/01), 793 So.2d 1286. If the instrument purporting to create a building restriction is susceptible to more than one reasonable interpretation, thereby creating ambiguity and doubt as to the subdivider’s intent, the interpretation that least restricts the property will apply. Head v. Gray, 41,290 *1207 (La.App. 2 Cir. 8/23/06), 938 So.2d 1084. Apart from the rule of strict interpretation, documents establishing building restrictions are subject to the general rules of the Louisiana Civil Code governing the interpretation of juridical acts.[4] Cashio, 481 So.2d at 1015.
The Civil Code provides that the “words of a contract must be given their generally prevailing meaning.” La. Civil Code Art. 2047. Further, words of art and technical terms “must be given their technical meaning when the contract involves a technical matter.” Id. Additionally, “words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.” La. Civil Code Art. 2048. Moreover, “a provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.” La. Civil Code Art. 2049. Nevertheless, the fact that a term is not defined in a contract itself does not alone make that term ambiguous. Burmaster v. Plaquemines Parish Government, 10-1543, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 312, 317. Further, each provision in a contract must be interpreted in light of the other provisions so that each provision is given the meaning suggested by the contract as a whole. La. Civil Code Art. 2050.
| ^Section 7.2 of the covenant provides, in pertinent part that each “lot ... deemed as a residential Lot, shall be used for residential purposes only, and no trade or business of any kind may be carried on therein.” The phrase “trade or business of any kind” is not defined in the covenant. However, Black’s Law Dictionary (8th Ed.) defines the word “trade” accordingly: 1) the business of buying and selling or bartering goods or services; commerce; 2) a transaction or swap; 3) a business or industry occupation; a craft or profession. Further, Black’s Law Dictionary (8th Ed.) defines “business” variously: 1) a commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain; 2) commercial enterprises; 3) commercial transactions. Further, Black’s Law Dictionary (4th Ed.) defines the phrase “carry on trade or business” accordingly: “To conduct, prosecute or continue a particular avocation or business as a continuous operation or permanent vocation.” Similarly, the American Heritage Dictionary (2nd College Edition), in discussing the various meanings of the word “business,” notes that it “pertains broadly to all gainful activity.”
Although the phrase has a broad scope, it appears to be limited somewhat when read in conjunction with other provisions in the covenants. For example, Section 7.2 allows a lot owner to use a portion of their dwelling as an office, provided that the use does not create “regular customer, client, or employee traffic.” Section 7.2 also permits a lot owner to use a portion of their lot for business meetings, entertainment, or the enjoyment or business of the owner’s employees, trustees, agents, clients, or customers provided the use “does not create regular customer, client or employee traffic.” On the other hand, the covenants prohibit the construction of condominiums on all but Lots 83-A and 83B. | j4Similarly, the covenant prohibits the construction of more than one dwelling per lot on all lots except Lots 82 and 83-C. Lot 9 has been set aside for the construction of a waterway. All other lots are dedicated to single dwelling, residential use. Further, Section 9.3 flatly prohibits commercial farming, fishing, gardening, and animal husbandry. Thus, the Company’s lot is designated solely for single dwelling, residential use. In other words, *1208 the covenant permits a lot owner to use its property for limited, sporadic business purposes provided such use does not result in regular traffic to and from the lot. It appears, then, that Section 7.2’s prohibition on trade or business of any kind is meant to protect the residential nature of the Company’s lot by insuring that nonresidential uses do not subvert the residential nature of its designation. Thus, the phrase “trade or business of any kind,” as used in Section 7.2 of the covenant, should be read to prohibit all gainful activity, except for the type of previously described residentially based business activities that do not result in regular traffic.
B
The Company also conducted business activities on its lot. The Company constructed five boat slips, leased out four of the slips, and shared the launch and hoist facilities, ice machine, electricity, and fish-cleaning area with its tenants. The Company’s corporate representatives denied that it was seeking to operate a business on the lot. Rather, the representatives described the lot as a “camp,” a way for them and their friends to enjoy the outdoors, the camaraderie of friends, and water sports in the St. Bernard area. The Company also contends that the club was a private, unadvertised association of old friends and fishing buddies, and annual sums paid to the LLC for the slip rentals and use of the facilities served to defray expenses. The record indicates that the Company listed the sums received hsfrom the tenants as rental income and depreciated the property and equipment on its tax returns. The Company had no employees for whom W-2’s were issued, nor did it issue K-l forms to the slip lessees.
C
In this part, we consider the assignment of error by the Association: whether the trial court correctly found that the Association failed to prove that the Company’s use of Lot 16A as a sports camp was a business violative of the Association’s covenants and restrictions. This Court reviews findings of fact under the manifest error standard of review. Fairway Estates Homeowners Ass’n, Inc. v. Jordan, 08-0949, p. 4 (La.App. 4 Cir. 5/20/09), 15 So.3d 1011, 1014. We may not set aside a district court’s finding of fact unless it is clearly wrong. We must be cautious not to reweigh the evidence or substitute our own findings, and where there are two permissible views of the evidence, the fact finder’s choice cannot be manifestly erroneous or clearly wrong. Bass, Ltd. v. Gerald, 06-1125, p. 3 (La.App. 3 Cir. 3/7/07), 954 So.2d 243, 246.
A review of the trial court’s reasons for judgment reveals that it accepted the testimony of Regan Leopold when he testified that the Company’s lot was for sports and outdoor pleasure, not financial gain. Nevertheless, the record indicates that the Company’s lot was intended by covenant to be used solely for residential purposes. The record also indicates, however, that the Company has used its lot for anything but residential purposes. Indeed, the Company has yet to build any type of residence or camp on the lot. Further, the record establishes that the Company leased out four of its five boat slips. Additionally, the record reveals that the Company listed the sums received from its tenants as rental income on its tax 11 (¡returns. Further, the Association established that the LLC depreciated the cost of the shed, the pier, the boat hoists, the ice machine, and other miscellaneous items.
Moreover, Pat Pescay testified to the association receiving complaints from three neighbors on Blackbeard Key about the Company’s activities on the lot:
*1209 ... and we had complaints we had from people in the subdivision that they were running a business there, having boats go in and out, and traffic that wasn’t conducive to what we felt the amendments were stated for, for families to enjoy the surroundings and the premises and they had people going in there who we felt or the residents felt were conducting a business.
Thus, it is reasonable to infer that the tenants’ presence on the Company’s lot was sufficiently regular and ubiquitous to garner attention from neighbors. Regardless of Regan Leopold’s testimony, it is clear from the record that the Leopold brothers set up the LLC, configured the property, and leased out boat slips to either subsidize or offset the costs of operating a hunting/fishing camp. Clearly, the Company used its lot in a gainful, commercial manner that was incompatible with its residential designation. Therefore, we conclude that the trial court was clearly wrong in holding as a matter of fact and law that the Association failed to meet its burden of proving by a preponderance of the evidence that the Company was conducting business on Lot 16A.
REMAND INSTRUCTIONS
Within thirty days of the finality of this judgment, the district court, after notice and contradictory hearing, shall issue without bond a permanent injunction ordering that the defendants, their agents, tenants, assigns, and/or successors, cease all business and commercial operations or activities on Lot 16A, including but not limited to the direct or indirect leasing of boat slips, boat hoists, ice machine and |17any other amenities, and further to restrain and prohibit the use of Lot 16A for business or commercial purposes in the future.
DECREE
We affirm that part of the trial court’s judgment issuing the mandatory injunction to Leopold Holdings, LLC, to remove or demolish the shed within sixty days of the date of a final judgment.
We reverse that part of the trial court’s judgment denying an injunction to permanently prohibit and restrain Leopold Holdings, LLC, from operating a business on Lot 16A, including the leasing of boat slips and the compensated use of any facilities, and remand with instructions to the trial court for the issuance of a prohibitory injunction.
All costs assessed to Leopold Holdings, LLC. See La. C.C.P. ART. 2164.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

. See C.O.B. 588, Folio 554, St. Bernard Parish, State of Louisiana. An Amended and Restated Declaration of Covenants was made and filed on June 7, 2004, and recorded in C.O.B. 758, Folio 584, St. Bernard Parish, State of Louisiana, in order to correct discrepancies in the original documents filed on July 31, 1995.

. La. Civil Code Arts. 775-783.

. In general, an injunction will issue only in its prohibitory form, but when a defendant obstructs plaintiff in the enjoyment of a real right, the latter may be entitled to a prohibitory injunction restraining the disturbance and also to a mandatory injunction for the removal of the obstruction or to undo what has been illegally done. Concerned Citizens for Proper Planning, LLC v. Parish of Tangipahoa, 04-0270, pp. 6-7 (La.App. 1 Cir. 3/24/05), 906 So.2d 660, 664.

. Building restrictions are juridical acts. La. Civil Code Art. 776.