Judge Terri F. Love
_JjThe instant appeal arises from a dispute over British Petroleum (“BP”) settlement proceeds after the parties executed a sublease for certain oyster leases affected by the 2010 BP oil spill. The trial court found that it was the parties’ intent that seller would receive $90,000, and buyer would receive title to the leases. The trial court then found plaintiff was entitled to the settlement proceeds and any future damage distribution relating to the leases. We find the agreement entered into was a sublease with an option to purchase. Plaintiff was neither the leaseholder of record on the day of the Deepwater Horizon explosion, nor had he exercised his option to purchase, and the post-explosion purchase did not assign defendants’ BP settlement claims. Therefore, the trial court erred when it entered judgment in favor of plaintiff. Accordingly, the trial court’s judgment is reversed.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND

In 2009, plaintiff Nikola Vekic (“Mr. Vekic”) wanted to purchase three oyster leases (collectively “subleased property”) owned by Dragutin Popich (“Mr. Popich”) and his family (collectively “Popich family”). Mr. Popich was unwilling! 2 to execute a credit sale, but he agreed to enter a sublease with option to purchase. Roger Harris (“Mr. Harris”), an attorney and Mr. Popich’s son-in-law, prepared a sublease with option to purchase, a designation of agent to harvest, and a proposed act of sale. The documents were forwarded and reviewed by Mr. Vekic and his attorney along with a transmittal letter indicating that Mr. Popich was “unwilling to do a credit sale.”
Mr. Vekic had no suggested changes or issues with the proposed documents. According to the express sublease terms, Mr. Vekic agreed to sublease three oyster leases in Bay Boudreau in St. Bernard Parish from the Popich family. The term of the sublease was four years unless it was terminated earlier by either party in accordance with the sublease provisions. The amount of rent for the term of the sublease was not to exceed $90,000, and $30,000 was due and payable to the Popich *485 family upon execution of the agreement. Thereafter, rent in the amount of $20,000 was due and payable on the anniversary of the sublease commencement date for the next three years.
The sublease also set forth the terms that applied if Mr. Vekic exercised his option to purchase. The right and option to purchase was “exercisable at any time on or before April 30, 2012, to purchase the subleased property” for $90,000. To exercise the option, Mr. Vekic was required to provide written notice to the Popich family prior to the deadline and “any rental payments paid pursuant to [the agreement would] be credited against the purchase price in dollar-for-dollar amount.” Further, the subleased property was purchased and sold “as is.”
laThe parties executed the sublease agreement in April 2009 and Mr. Vekic issued the Popich family a check for $30,000 indicating in the memo section “sublease agreement.”
The next year, on April 20, 2010, the Deepwater Horizon well exploded. At the time of the explosion, Mr. Vekic had not yet exercised his option to purchase and the Popich family remained the leaseholder of record. The following year, on or about June 19, 2011, Mr. Vekic exercised his option to purchase. The act of sale, originally prepared in 2009, was executed by the parties without any alterations to its original terms.
Shortly after the Deepwater Horizon explosion, a plaintiff class sued BP for damages and losses resulting from the oil spill. By 2012, BP and the Plaintiffs’ Steering Committee reached a settlement agreement (“BP Settlement Agreement”), which established a compensation plan for qualifying oyster leaseholders in exchange for settling their claims with BP and other released parties. To receive settlement proceeds, claimants were required to: (1) file a claim form with Deepwater Horizon Economic Claim Center (“DHECC”); (2) provide documents showing they were record owners of the leases with the Department of Wildlife Fisheries on the day of the explosion; (3) show that their oyster leases had State ID numbers; and (4) provide documents showing the geographic area in which the oyster leases were located.[1]
In June 2012, Mr. Vekic fíled a claim with DHECC for all of his lease! ⅜ holdings, including the subleased property. In January 2013, Helen Popich Harris (“Mrs. Harris”), attorney and daughter to Mr. Popich, prepared and filed claims for herself, her father, and her sister. Their claim forms expressly informed the DHECC of the 2009 sublease with Mr. Vekic and the 2011 post-explosion sale of the subleased property. They also indicated that “the claimants did not transfer or assign any rights to the cause of action for the Deepwater Horizon incident to Mr. Vekic.”
Subsequently, Mr. Vekic received a proposed settlement offer for his lease holdings. However, DHECC excluded the subleased property from Mr. Vekic’s recovery. There is no indication in the record that Mr. Vekic sought review of DHECC’s decision. The Popich family received notice of their proposed settlement offer as eligibile oyster leaseholders. The Popich family’s proposed settlement offer for the subleased property totaled $901,999.50.[2] In exchange for receipt of the settlement proceeds, the Popich family executed a release of any claims “arising out of, due to, or *486 relating in any way to, directly or indirectly, the Deepwater Horizon Incident.”
After the first round of payment was issued, Mr. Velde sued the Popich family alleging he was entitled to the BP settlement proceeds pursuant to their agreement. The Popich family later received eligibility notices for a second round payment, totaling $365,797.79. Before the Po-pich family received the second round payment, the trial court ordered the proceeds deposited into the IOLTA ^account of counsel for the Popich family until further order from the court,[3]
Mr. Vekic sought a declaratory judgment, claiming that he was entitled to the proceeds as a result of the sublease agreement. He amended his petition twice thereafter and ultimately claimed that the sublease was a disguised sale and security agreement. The first day of trial was held in January 2015 and the second day in March 2015, but judgment was not rendered until January 2016. The Popich family’s motion for new trial was granted, and the trial court rendered a new judgment in March 2016.[4]
The trial court interpreted the sublease agreement as a sale of subleased property to Mr. Vekic in exchange for $90,000. Therefore, the trial court found Mr. Vekic was entitled to the BP settlement proceeds. The trial court awarded Mr. Vekic all of the proceeds, less the ten percent attorney’s fees on past BP settlement proceeds and costs pursuant to the contingency fee agreement between the Popich family and their attorney. However, the trial court ruled that any future payments from BP belong to Mr. Vekic to the exclusion of the Popich family and without any reduction for further attorney’s fees owed. The Popich family timely filed the instant appeal.

STANDARD OF REVIEW

In general, “a contract, subject to interpretation on the four corners of the instrument without the necessity of extrinsic evidence, is interpreted as a matter of | Jaw.” New Orleans Jazz & Heritage Found., Inc. v. Kirksey, 09-1433, p. 9 (La. App. 4 Cir. 5/26/10), 40 So.3d 394, 401 (citing Bartlett Constr. Co., Inc. v. St. Bernard Parish Council, 99-1186, p. 6 (La. App. 4 Cir. 5/31/00), 763 So.2d 94, 98). The following sets forth the standard of review that applies to contractual interpretation:
Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is whether the trial court was legally correct or legally incorrect.
Kirksey, 09-1433, p. 9, 40 So.3d at 401 (quoting Clinkscales v. Columns Rehab. & Ret. Ctr., 08-1312, p. 3 (La.App. 3 Cir. 4/1/09), 6 So.3d 1033, 1035-1036) (emphasis added).
Our interpretation of the agreement is not premised on the trial court’s factual findings but based on an independent review and examination of the agreement on its face. Thus, the manifest error rule does not apply.

*487
DISCUSSION

The ultimate issue in this case is whether Mr. Vekic is entitled to the BP settlement proceeds in light of the parties’ 2009 agreement. Thus, we examine the contract in search of the parties’ intent.

Intention of the Parties

The parties assert competing interpretations of them agreement. Mr. Vekic contends that the sublease agreement with option to purchase was a sale in disguise in that it was drafted in a way that “handed [Mr.] Vekic all of the obligations of a) 7 title holder, while disguising him as a tenant.” He states in his brief that the trial court “made no determination regarding whether the sublease was a true sublease or a sale in disguise.” Mr. Vekic avers that this Court “is free to make this determination de novo.” However, if we find the agreement was a credit sale with security protection for the seller, Mr. Vekic alternatively argues that he acquired title to the leases on April 13, 2009, and therefore, owned the leases on the date of the oil spill.
The Popich family asserts that the agreement is, by its express terms, a sublease with option to purchase. They allege that the sublease is not a sale in disguise because: it contains no language transla-tive of title; there was no need for a disguised sale; and, even if it was a disguised credit sale it would have no force or effect.
Given the express terms of the sublease, the Popich family also contends extrinsic evidence is not required to determine the parties’ intent. Even so, Mr. Popich expressly refused to convey ownership on the promise to pay later. Mr. Harris forwarded a transmittal letter to Mr. Vekic’s attorney with the sublease documents which expressly stated that “Mr. Popich is unwilling to do a credit sale....” Therefore, the Popich family asserts that the parties did not intend a credit sale.
“When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.” La. C.C. Art. 2046. “A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.” La. C.C. Art. 2049. Likewise, the provisions of a contract “must be interpreted in light of the other provisions so that each is given the meaning |ssuggested by the contract as a whole.” La. C.C. Art. 2050. “Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include.” La. C.C. Art. 2051. “A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.” La. C.C. Art, 2053. “When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.” La. C.C. Art. 2054.
Should a court find after examining the four corners of a contract that the contract is ambiguous, the agreement must be construed according to the intent of the parties, which is to be inferred from the surrounding circumstances. Kirksey, 09-1433, p. 10, 40 So.3d at 401 (citing Derbes v. GBS Properties, 04-1460, p. 5 (La.App. 5 Cir. 4/26/05), 902 So.2d 1109, 1111).
The trial court found Mr. Vekic entitled to the BP settlement proceeds. The trial court stated:
*488 This agreement when originally contemplated and entered into had one result: that the seller would receive $90,000 dollars and the buyer would get title to the leases. This was the original intention of the parties and nothing further. Based on that agreement it is the ruling of this Court that the monies received by Defendants are monies that are owed to the Plaintiffs.
Although the trial court’s ruling does not specify whether the court found the agreement to be a sublease or a sale in disguise, it does suggest that the court agreed with Mr. Vekic’s interpretation that the parties intended to enter into a sale [¡¡agreement rather than a sublease. A review of the contract on its face convinces us otherwise.
At the outset, we find the words of the sublease are clear and explicit. It identifies the Popich family as the lessor and owner of the subleased property and Mr. Vekic as the lessee. It describes the parties’ intent as the desire for the lessor to “lease said oyster leases to [l]essee, and [l]essee desires to lease same from [ljessor on the terms and subject to the conditions set forth in this Agreement.” We find this language alone indicative of the parties’ intent. The sublease also sets forth the term of the lease and amount of rent.
The parties dispute, however, the function of the option to purchase provision. An option to purchase “is a contract whereby a party gives to another the right to accept an offer to sell, or to buy, a thing within a stipulated time. An option must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.” La. C.C. Art. 2620. The option to purchase, prepared by Mr. Harris, met all the requirements of La. C.C. Art. 2620.
Mr. Vekic argues that the format of the sublease was chosen because a conditional sale, whereby the owner retains title until payment is made in full, is prohibited in Louisiana. A conditional sale of a movable is prohibited in Louisiana; however, a conditional sale of an immovable is not. Montz v. Theard, 01-0768, p. 6 (La.App. 1 Cir. 2/27/02), 818 So.2d 181, 186. In that oyster leases are considered incorporeal immovables pursuant to La. C.C. Art. 470, there was no need to disguise a credit sale as a sublease with option to purchase. The fact that the parties did not enter a credit sale when they could have is proof that the agreement is not a disguised credit sale.
Additionally, a conditional sale is distinguishable from a lease in that it | ^contemplates ultimate ownership by the purchaser. Despite having the money upfront to purchase the leases, Mr. Vekic preferred to pay over time. While a credit sale would have accomplished Mr. Vekic’s goals, Mr. Popich was “unwilling to do a credit sale.” Hence, the parties agreed to enter a sublease with option to purchase. This format would allow Mr. Vekic to purchase the leases so long as he fully complied with the terms of the sublease and timely exercised the option to purchase. Until that time, the Popich family would remain the title owner of the subleased property. Therefore, we do not agree with Mr. Vekic’s assertion that his interpretation expresses the contractual intent in light of the fact that he was aware Mr. Popich was unwilling to execute a credit sale and the agreement lacked language translative of title.
Mr. Vekic also asserts that the sublease “handed [Mr.] Vekic all of the obligations of a title holder, while disguising him as a tenant.” Consequently, he concludes that because the sublease terms are inequitable it is a sale in disguise. “Parties are free to contract for any object that is lawful, possible, and determined or determinable.” La. C.C. Art. 1971. Mr. Vekic was represented by counsel and had an opportunity to review the agreement and propose any *489 changes but offered none. Mr. Vekic’s attorney informed Mr. Harris that Mr. Vekic was “good with everything the way it was.” Mr. Vekic knowingly obligated himself to the terms of the sublease. This argument lacks merit.
Furthermore, Mr. Vekic claims that the sublease is a disguised sale given the features the sublease lacks. He states that “an essential, legal element” of a sublease with an option to purchase is the requirement that the buyer pay additional consideration to exercise his purchasing option. Based on the contract’s terms, Mr. Vekic owed no additional consideration for exercising his option. However, “[t]he | nrequirement of ‘consideration’ contained in Article 2462 of the Louisiana Civil Code of 1870 [wa]s eliminated since it is inconsistent with the Louisiana system.” La. C.C. Art. 2620, Comment (h) (1993).
Under Mr. Vekic’s interpretation of the sublease, title transferred in April 2009 when the parties entered into a contractual relationship. For any transfer of an oyster lease to be “valid or of any force or effect whatsoever” it must be recorded and “evidenced by an authentic act, judgment, or proper judicial deed registered in the office of the [Department [of Wildlife and Fisheries]....” La. R.S. 56:428(E). Mr. Vekic fails to confront this authority.[5] Even if we found that the sublease was a disguised credit sale, which we do not, it would have no force or effect.
For these reasons, we find the parties intended to enter into a sublease with option to purchase and nothing more. We address next whether Mr. Vekic is entitled to the BP Settlement Proceeds.

Entitlement to BP Settlement Proceeds

The Oyster Compensation Plan stated that to be eligible to participate in the settlement claims process claimants had to provide “a valid oyster lease entered into by Claimant that establishes, as of April 20, 2010, the Claimant as the lessee of the oyster leasehold, or a copy of the actual title for the leasehold.” Mr. Vekic concedes that he could not make this showing.[6] Although he was not “eligible to participate,” he insists nonetheless that he is entitled to the proceeds pursuant to his contract with the Popich family.
1 jgMr. Vekic’s claim rests entirely on the assumption that the parties intended to enter a sale agreement and not a sublease. As discussed, the terms of the contract demonstrate that the parties intended to enter a sublease agreement with an option to purchase. Therefore, we examine whether any provision under the sublease entitles Mr. Vekic to the BP Settlement proceeds.
Section 9 (“Proceeds for Damages to Oyster Leases”) of the sublease states that in the event of damages to the leases Mr. Vekic was entitled to receive his actual loss. The sublease defined “actual loss” as the cost of bedding oysters in the damaged area. Mr. Vekic had the right to damage proceeds “in an amount sufficient to reimburse” him. “[Proceeds in excess of the reimbursed amount [would] be received by [the Popich family] as advance rent.” Mr. Vekic stipulated at trial that he had no “actual loss” as defined in the sublease. Additionally, no evidence was submitted at *490 trial to show that the oil spill damaged the oyster leases.
The provision does not address whether Mr. Vekic or the Popich family would get damage proceeds exceeding bedding reimbursement and advance rent. Thus, the sublease is interpreted to include only those things it appears the parties intended to include. La. C.C. Art. 2051. The trial court determined that the parties did not contemplate a situation in which lease damage proceeds would be anything more than actual loss, much less the result from an event like the BP oil spill. Nevertheless, the trial court’s ruling suggests that it found damages exceeding and/or unrelated to actual loss belonged to Mr. Vekic because it awarded him the proceeds.
When parties make no provision to account for a particular situation, “it must be assumed that they intended to bind themselves. . .to the express provisions of the contract [and] to whatever the law, equity, or usage regards as implied in a| 1S contract of that kind or necessary for the contract to achieve its purpose.” La. C.C. Art. 2054. Louisiana courts have consistently held that a purchaser is precluded from claiming damages to property that occurs prior to the purchaser’s acquisition of the property. Eagle Pipe & Supply, Inc. v. Amerada Hess Corp., 10-2267 (La. 10/25/11), 79 So.3d 246; Boone v. Conoco Phillips Co., 13-1196 (La.App. 3 Cir. 5/7/14), 139 So.3d 1047. In Eagle Pipe the Louisiana Supreme Court explained:
[A]n owner of property has no right or actual interest in recovery from a third party for damage which was inflicted on the property before his purchase in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted.
Id., 10-2267, p. 8, 79 So.3d at 256-57. Furthermore, the assignment must be specific. Id., 10-2267, p. 38-39, 79 So.3d at 276; Lejeune Bros., Inc. v. Goodrich Petroleum Co., L.L.C., 06-1557, p. 9 (La. App 3 Cir. 11/28/07), 981 So.2d 23, 30.
The act of sale executed in 2011 contains no reference to an express assignment by the Popich family to Mr. Vekic of any rights to seek damages from BP. Moreover, Mr. Vekic did not request that the act of sale be modified to include a specific assignment of the Popich family’s rights, as oyster leaseholders, against BP. Although Eagle Pipe is distinguishable because it involved non-apparent pre-sale damage to property, the Popich family contends that “Mr. Vekic, along with the rest of the Gulf Coast, knew full well of the Deepwater Horizon explosion and oil spill.” See Eagle Pipe, 10-2267, p. 38-39, 79 So.3d at 276 (“whether damage to the property is apparent or not, the personal nature of the right of the landowner at that time does not change, and remains with the landowner unless the right is explicitly assigned or subrogated to another”); Boone, 13-1196, p. 8, 139 So.3d at 1053.
Mr. Vekic elected to exercise his option to purchase after the oil spill. [ 14Moreover, Mr. Vekic purchased the oyster leases “as-ís” and without seeking an amendment to the act of sale to include an express assignment of the Popich family’s oyster leaseholder claims against BP. Even though the sublease did not contemplate the BP oil spill, the parties were aware of the possibility of damage to the leases when the act of sale was entered.[7] Therefore, we find an express assignment necessary in this case.
*491 The fact that Mr. Vekic signed the agreement with every intention of one day obtaining title to the subleased property is irrelevant when he knowingly obligated himself to the sublease terms. Those terms required Mr. Vekic to exercise his option in writing on or before April 30, 2012, as well as pay the $90,000 purchase price, wherein rent paid under the sublease was credited dollar for dollar against the purchase price. Only then would Mr. Vekic take title and ownership of the subleased property.
Mr. Vekic deliberately did not buy the leases in 2009 despite having told Mr. Harris that he had the money to do so. Instead, he waited over a year after the oil spill to exercise his option. Mr. Vekic established a real right to the subleased property (i.e. ownership) upon execution of the act of sale. However, the act of sale did not transfer the Popich family’s personal rights.
The BP Settlement Agreement created a contractual right with oyster leaseholders who could prove valid and recorded leasehold ownership at the time of the oil spill. The Popich family contends that the BP Settlement Agreement established personal rights for the Popich family. In that Mr. Vekic had not exercised his option to purchase prior to the oil spill, he was neither eligible nor 1 ^.entitled to recovery directly from BP. Since Mr. Vekic exercised his option after the oil spill, it was incumbent upon him, pursuant to Eagle Pipe, to obtain a specific assignment of the Popich family’s claims against BP prior to executing the act of sale. Mr. Vekic failed to do so. Therefore, he is not entitled to the proceeds under the sublease with option to purchase or the law. For the foregoing reasons, we find the trial court erred by ruling in Mr. Vekic’s favor.

DECREE

We find based on the explicit and clear terms of the contract that the parties intended to enter a sublease with option to purchase. Furthermore, we find Mr. Vekic was not the leaseholder of record on the day of the Deepwater Horizon explosion and oil spill as he had not exercised his option to purchase. Likewise, the post-explosion purchase did not assign the Popich family’s claims against BP for the BP settlement proceeds. Accordingly, Mr. Vekic is not entitled to the BP settlement proceeds pursuant to the sublease with option to purchase, the BP Settlement Agreement, or the law. In light of our finding, we pretermit discussion of the Popich family’s other assigned errors regarding attorney’s fees[8] and legal interest. The judgment in Mr. Vekic’s favor, awarding him the BP settlement proceeds as well as any future amounts paid by BP, is reversed.
REVERSED

. The compensation offered for oyster leases located in Zone A, which encompassed the three leases at issue, was $2,000 per acre.

. The Popich family netted $598,722.69 after taxes and attorney fees.

. The second round of proceeds was later deposited into the registry of the court pending the outcome of the present appeal.

, The January 2016 judgment was not dispos-itive of all issues regarding the proceeds Mr. Vekic was entitled to, therefore, promulgating the motion for new trial and the March 2016 judgment.

. The 2009 "Designation of Agent to Harvest Oysters,” naming Mr. Velde the designated agent pursuant to La. R.S. 56:424(B), did not translate title ownership, unlike the "Sale of Oyster Leases Pursuant to [sic] R.S. 56:423(E).

. Despite receiving notice of his eligibility and ultimately accepting BP settlement proceeds for those leases which he held a valid title, the DHECC denied his claims for the subleased property.

. The Popich family contends Mr, Vekic failed to present at trial evidence of damage to the subleased property.

. In his Answer to the appeal, Mr. Velde assigned as error the trial court's ruling that awarded Mrs. Harris and her law firm attorney fees for the first and second rounds of settlement proceeds BP issued. We pretermit this assignment of error as well.