# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #050

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **18th day of October, 2017**, are as follows:

**BY GENOVESE, J.:**

2017-C -0698     NIKOLA P. VEKIC v. DRAGUTIN POPICH, MARY A. POPICH & HELEN HARRIS
                 POPICH (Parish of St. Bernard)

                 This case concerns a contractual dispute regarding which party is
                 entitled to the proceeds from the BP oil spill settlement for
                 damages to certain oyster leases.  We disagree with the Court of
                 Appeal and find that the trial court did not err in accepting
                 evidence beyond the four corners of the contract at issue and did
                 not manifestly err in its factual findings and ultimate
                 interpretation that the agreement at issue entitled the plaintiff
                 to the settlement proceeds for property damage to the leases at
                 issue. For the foregoing reasons, we reverse the Court of
                 Appeal's decision and reinstate the trial court's judgment.
                 REVERSED.

                 WEIMER, J., concurs in part and dissents in part and assigns
                 reasons.

SUPREME COURT OF LOUISIANA

No. 2017-C-0698

NIKOLA P. VEKIC

VERSUS

DRAGUTIN POPICH, MARY A. POPICH & HELEN HARRIS POPICH

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ST. BERNARD

GENOVESE, Justice

This case concerns a contractual dispute regarding which party is entitled to the proceeds from the British Petroleum ("BP") Deepwater Horizon oil spill settlement for damages to certain oyster leases. As discussed in detail below, we disagree with the Court of Appeal and find that the trial court did not err in accepting evidence beyond the four corners of the contract at issue and did not manifestly err in its factual findings and ultimate interpretation that the agreement at issue entitled the plaintiff to the settlement proceeds for property damage to the leases at issue.

## FACTUAL AND PROCEDURAL HISTORY

In 2009, plaintiff Nikola Vekic (Mr. Vekic) sought to buy three oyster leases which were jointly owned by Dragutin Popich (Mr. Popich) and his daughters Mary Popich and Helen Popich Harris (Mrs. Harris) (collectively "the Popich family"). Although the parties dispute the content of the discussions which took place between them regarding the sale of the three oyster leases, it is undisputed that the Popichs' lawyer, Roger Harris (Mr. Harris, husband of Mrs. Harris), transmitted a letter stating that Mr. Popich was "unwilling to do a credit sale." Instead, Mr. Harris drafted and submitted an agreement entitled "Sublease Agreement With Option to Purchase" ("agreement"), along with a proposed act of sale to Mr. Vekic, who

reviewed the documents along with his attorney. Mr. Vekic executed the sublease agreement on April 14, 2009, without raising any issues regarding its contents.

Under the agreement, Mr. Vekic agreed to sublease three oyster leases comprising approximately 451 acres of State-owned waterbottoms in Bay Boudreau, St. Bernard Parish, from the Popich family. Although Mr. Popich had been an oyster fisherman, he had not recently worked the leases at issue and was retiring from the oyster business. The amount of total "rent" due was $90,000, with $30,000 due upon execution of the agreement (April 14, 2009) and three installments of $20,000 due annually thereafter on the anniversary of the agreement's execution. Mr. Vekic's option to purchase under the agreement was "exercisable at any time on or before April 30, 2012." To exercise the option, the agreement required Mr. Vekic to provide written notice to the Popich family, and "any rental payments paid pursuant to [the agreement would] be credited against the purchase price in dollar-for-dollar amount." The agreement stipulated the total purchase price was to be $90,000, with no additional consideration required for the exercise of the option and with the leases being sold "as is."

The terms of the artfully-crafted agreement differed significantly from a typical lease or sublease in that the Popich family transferred all of the rights and responsibilities of ownership to Mr. Vekic without the benefit of a formal transfer of title between the parties. Mr. Vekic was bound to pay the full $90,000 in "rent" regardless of whether the leases were damaged or were even subject to a complete taking. Mr. Vekic could not under any condition terminate the lease and was responsible for fulfilling all of the legal requirements to maintain the leases, including paying the $2 per-acre lease fee to the Department of Wildlife and Fisheries.

2

Importantly, as will be discussed in detail, Section 9 of the agreement, entitled "Proceeds for Damage to Oyster Lease(s)," provided that:

> Claims for damages to or destruction of any portion of the subleased property **shall be adjusted by Lessee;** however, Lessor, at his sole option and discretion, shall have the right to join with Lessee in adjusting any such claims. Lessee shall have the right to proceeds derived from such claims in an amount sufficient to reimburse Lessee for Lessee's actual loss (i.e., the cost of bedding oysters in the damaged area); proceeds in excess of such reimbursed amount shall be received by Lessor as advance Rent.

(Emphasis added.)

Upon execution of the agreement in April 2009, Mr. Vekic issued the Popich family a check for $30,000, which indicated the payment was for "sublease agreement." The sublease was recorded with the Department of Wildlife and Fisheries, and Mr. Vekic was recorded as an agent entitled to work the leases, although the Popich family remained leaseholders of record.

On April 10, 2010, Mr. Vekic paid an installment of $30,000 to the Popich family, which was $10,000 above the $20,000 annual installment required by the agreement. This payment brought the total "rent" paid for the leases up to $60,000 of the $90,000 purchase price as of that date. Ten days later, the British Petroleum Deepwater Horizon well exploded ("the spill"). After the spill, the area where the leases at issue were located was closed off from fishing activities for a considerable amount of time. Mr. Vekic paid the Popich family the remaining $30,000 he owed under the agreement in May, 2011. On June 19, 2011, Mr. Vekic exercised his option to purchase, and the parties executed the act of sale, which had been prepared in 2009 along with the original agreement, without any modifications ("Act of Sale").

In the wake of the spill, a class action lawsuit was filed against BP. BP and the Plaintiffs' Steering Committee agreed upon a settlement in 2012 which, among other things, established a "compensation plan" for oyster leaseholders. Mr. Vekic

3

filed a claim with the Deepwater Horizon Economic Claim Center ("DHECC") in June 2012 for his and his father's lease holdings, which comprised approximately 2000 acres. Mr. Vekic's claim to the DHECC also included the leases at issue. In January 2013, Mrs. Harris, an attorney, prepared and filed claims for the Popich family, informing the DHECC of the 2009 agreement with Mr. Vekic and post-spill Act of Sale.

When Mr. Vekic received a proposed settlement offer for his lease holdings, the DHECC excluded the subleased property from Mr. Vekic's recovery. The Popich family, on the other hand, received a proposed settlement offer for the leases at the $2000 per acre amount provided by the compensation plan for the area which included the leases herein for a total of $901,999.50.[1] Accepting this offer, the Popich family executed a release of any claims "arising out of, due to, or relating in any way to, directly or indirectly, the Deepwater Horizon Incident."

Mr. Vekic filed the instant suit after the Popich family received the first round of settlement proceeds, seeking a declaratory judgment that he was entitled to the proceeds. Before the Popich family received their second round of payments under the settlement offer, the trial court ordered that the proceeds be placed in an IOLTA account, pending resolution of the dispute between the parties. After amending his petition twice, Mr. Vekic alternatively argued that the sublease was a disguised sale and security agreement. The trial court rendered its first judgment in Mr. Vekic's favor in January 2016. The Popich family filed a motion for new trial because the judgment was not dispositive of all issues, which motion was granted. The trial court rendered a second judgment in March 2016. The second judgment awarded Mr.

---

[1] The $2000 per acre figure came from the oyster compensation plan based on the subject leases' location in "Zone A," the geographic area deemed most affected by the spill.

4

Vekic the settlement proceeds less ten percent attorney's fees on past BP settlement proceeds and costs pursuant to the contingency fee agreement the Popich family had executed with Mrs. Harris. All future payments of BP settlement proceeds were awarded to Mr. Vekic.

The Popich family appealed. In its opinion, the Fourth Circuit reversed the trial court, finding that the contract on its face clearly and expressly constituted a sublease and finding that Section 9 "d[id] not address whether Mr. Vekic or the Popich family would get damage proceeds exceeding bedding reimbursement and advance rent." *Vekic v. Popich,* 16-508, p.12 (La.App. 4. Cir. 3/29/17), 215 So.3d 483, 490. Citing *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 10-2267 p. 13 (La. 10/25/11), 79 So.3d 246, 256-57, the Court of Appeal stated that "Louisiana courts have consistently held that a purchaser is precluded from claiming damages to property that occurs prior to the purchaser's acquisition of the property." *Vekic,* 215 So.3d at 490. Finding Mr. Vekic did not obtain an express assignment of claims for property damage prior to the 2011 Act of Sale, the Court of Appeal thus concluded that "he is not entitled to the proceeds under the sublease with option to purchase or the law." *Id.* at 491. We disagree.

## DISCUSSION

Although, as the Court of Appeal correctly noted, a purchaser is precluded from claiming property damages which occurred prior to the purchaser's acquisition of the property as set forth in *Eagle Pipe*, the facts in this case are readily distinguishable from this Court's ruling in *Eagle Pipe*. Rather, as described above, the original agreement confected by the parties specifically contemplated and included Section 9, entitled "Proceeds for Damage to Oyster Lease(s)." Section 9 specifically states, "**Claims for damage** to or destruction of any portion of the

5

subleased property **shall be adjusted by Lessee**…." (Emphasis added.) The BP compensation plan for oyster leaseholders was specifically designed to resolve **property damage claims** for oyster leases. The use of the word "shall" indicates a mandatory requirement; thus, the Popich family expressly assigned their right to adjust all damage claims to Mr. Vekic, and Mrs. Harris's filing of the claim with the DHECC violated the contract between the parties.

Mrs. Harris specifically testified at trial that, although reimbursement of "actual costs" and payment of "advance rent" were contemplated under Section 9, the Popich family did not contemplate that any possible property damages could surpass the amount of rent due. As the sublease did not specify which party would be entitled to damages in excess of the $90,000 in "rent," and given the parties' competing interpretations on this point, we find the trial court correctly determined that the agreement was ambiguous and looked to extrinsic evidence and testimony to determine the parties' intent.[2] "Interpretation of a contract is the determination of the common intent of the parties." La.Civ.Code. art. 2045.

Although the agreement does not expressly provide that the excess damages would go to Mr. Vekic, it does not allow anyone other than Mr. Vekic to adjust claims for damages, nor does it provide that the Popich family may receive anything other than the $90,000 specified in "rent" (along with fees or costs associated with late payment or default). Section 9 of the agreement reflects that the parties clearly contemplated that the agreement would cover all claims for property damages (as indicated by the requirement that the claims **shall** be adjusted by the lessee). Despite the unexpected large amount of damage proceeds in controversy, this subject matter

_____

[2] Notably, it was the Popich family that argued to the trial court that the agreement was ambiguous. Mr. Vekic asserted that he was entitled to summary judgment under the clear language of the agreement.

6

is clearly within the purview of this agreement. Thus, it was the trial court's task to determine the intent of the parties and allocate the excess damages accordingly. The trial court's findings of facts in this respect are subject to a review for manifest error, and the Court of Appeal erred in conducting a *de novo* review and in giving no deference to the trial court.

Without even going past the four corners of the agreement between the parties, the agreement itself contains support for the trial court's conclusion that it was the intent of the parties that the Popich family receive $90,000 for the transfer of oyster leases and nothing more. "Each provision in a contract must be interpreted in light of the other provisions that each is given the meaning suggested by the contract as a whole." La.Civ.Code. art. 2050. In addition to Section 9, the agreement between the parties repeatedly shifts all responsibility and the risk of loss for the oyster leases to Mr. Vekic. Section 6.02 of the agreement, entitled "No Termination," provides:[3]

> Except as expressly provided herein, this Sublease shall not terminate, nor shall Lessee have any right to terminate this Sublease, nor shall Lessee be entitled to any abatement or reduction of Rent or Additional Rent hereunder, nor shall the obligations of Lessee under this Sublease be affected by reason of: (i) any damage to or destruction of all or any part of the subleased property from whatever cause; (ii) the taking of the subleased property or any portion thereof; (iii) the prohibition, limitation or restriction of Lessee's use of all or any part of the subleased property, or any interference with such use; (iv) any default on the part of the Lessor under this sublease, or under any other agreement to which Lessor and Lessee may be parties; or (v) any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Lessee hereunder shall be separate and independent covenants and agreements, [sic] that the Rent, the Additional Rent and all other sums payable by Lessee hereunder shall continue to be payable in all events and that the obligations of Lessee hereunder shall continue unaffected.

---

[3] The agreement provides that it shall not terminate "[e]xcept as otherwise expressly provided herein." The only express provisions of this kind allow (1) that termination occurs at the end of the four-year sublease term (Section 2); (2) that the lessor may terminate the lease after "an event of default" (Section 13.02); or (3) that the lessor, at its option, may terminate the sublease upon the lessee's bankruptcy (if permitted by law) (Section 13.04).

In sum, this provision provides that Mr. Vekic must pay the "rent" specified regardless of whether the property is destroyed in whole or in part, whether it is taken in whole or in part, or whether the Popich family defaults in any manner.

The lease also contemplates how proceeds as a result of expropriation or condemnation will be distributed, providing:

> 10.02 **Complete Taking.** If [a complete taking occurs] during the Term, Lessor shall retain the first $90,000.00 of such amounts awarded or paid <u>less</u> the total amount of Rent previously paid by Lessee under this Sublease; **any remaining amounts shall be paid to Lessee**. …[4]

(Emphasis added.) Although the Popich family testified they had not contemplated that property damages could be more than $90,000, they clearly did contemplate that a complete taking could occur for which payment would surpass $90,000. In this case, the agreement provides that the Popich family is entitled to the first $90,000 paid, minus the total amount of rent previously paid. Mr. Vekic is entitled to the remainder. Interpreting the provisions of this contract in light of one another, as contemplated by La.Civ.Code art. 2050, the agreement evinces the parties' intent that every precaution be taken to ensure that the Popich family received $90,000 and nothing more, and that all liability, risk, and responsibility regarding the leases shifted to Mr. Vekic as of the time of the signing of the agreement,[5] even before the leases were formally transferred to Mr. Vekic.

---

[4] Section 10.03 addresses partial or temporary takings and specifies that such takings shall not result in a reduction of rent. However, it also provides, "Any amounts received by Lessor for such partial or temporary Taking shall be retained by Lessor; the Rent payable after the date of such retention shall be reduced by the amount of such retention."

[5] In addition to the provisions already discussed, Mr. Vekic was responsible for compliance with all laws and regulations at his expense under the agreement (Section 4.02). The agreement also provided that "[a]ny amount or obligation herein relating to the subleased property which is not expressly declared to be that of Lessor shall be deemed to be an obligation of Lessee to be performed by Lessee at Lessee's expense" (Section 6.01). The agreement further required Mr. Vekic to indemnify and hold harmless the Popich family "from and against any and all claims arising from the Lessee's use of the subleased property" (Section 8.01). Mr. Vekic also "assume[d] all risk of damage to property or injury to persons in, upon or about the subleased property arising from any cause" (Section 8.02).

8

Furthermore, though this agreement was labeled a "sublease," it had little or no indicia of a lease. It was essentially a transfer of an interest in and to the oyster leases with a guaranteed payment by Mr. Vekic of $90,000 to the Popich family. As set forth in Section 18.02 of the agreement, captions and headings "shall not be considered in any manner in the construction or interpretation of the Lease." Therefore, the fact that this agreement was labeled a "sublease" is of no significance in determining which party is entitled to property damage.

Looking at the extrinsic evidence, the parties' testimony demonstrates that the Popich family's sole concern with the agreement was insuring that they received $90,000 and that Mr. Vekic assumed all risk and responsibility for the leases. Consider the following colloquy between Mr. Vekic's counsel and Mrs. Harris:

> [Counsel for Mr. Vekic] Q. Okay. And is it true that the Popich family was agreeable to the payment of the 90,000 over time, but wanted to hold title as security for payment?
>
> [Mrs. Harris] A. Yeah, we weren't transferring title until payment had been received in full.
>
> Q. And the reason for that was you wanted security in case he didn't pay?
>
> A. Well, I just wanted to make sure my father got paid.
>
> ….
>
> Q. The way you looked at [it] is if he didn't pay it, you could boot him off the leases? You didn't have to sue him?
>
> A. I wouldn't have to sue him to get my leases back, right.

Mr. Vekic similarly testified that it was his understanding that the Popich family wanted $90,000 in payments over three years in return for the leases. He testified the significance of three years is that it represented the normal length of time that it took for oysters to spawn and grow to a harvestable size. Although Mr. Vekic normally bought leases outright, he explained to Mr. Popich that he wanted to pay

9

for the leases at issues over three years but that he "didn't know how [he] would go about doing this." Mr. Vekic testified that Mr. Popich replied as follows:

> And then he told me that his son-in-law [Mr. Harris] was an attorney, and his words to me were that the Louisiana law is crooked was the term he actually used, and that if he turned the leases over to me, and I didn't make that payment in time… He said I have no doubt in my mind that you wouldn't [sic] pay, but he said if you didn't then I would have to sue you and chase you, and you would have the leases, and it would be a lot of commotion. Whereas, if I hold them, and you don't pay me I got that for collateral.

Mr. Vekic further testified that Mr. Harris compared the transaction to the credit sale of a vehicle. Mr. Vekic also stated that he was the one who brought up the issue of damages, because he was concerned that he would not be the leaseholder of record with the Department of Wildlife and Fisheries. According to Mr. Vekic:

> [Mr. Vekic]. A. He [Mr. Harris] assured me that I would be covered under damages. I'm doing the work. It was just back to like owning a vehicle that I would be entitled to as long as I paid the $90,000. He just was covering his $90,000. I guess you would call it a security interest.
>
> [Counsel for Mr. Vekic] Q. When Mr. Harris told you that you would get the damages, did he discuss with you what the bargain was to him or to the Popichs, what they wanted out of the deal?
>
> A. To me it was clear that they w[ere] holding that for the 90,000 and only the 90,000. There [was] never any discussion about he'd get a percentage of the catch or the sack or anything like that. It was clearly, to me, that they w[ere] holding the title. As long as I paid the balance, then I would get clear title.

Mr. Harris, husband of Mrs. Harris and the attorney who drafted the agreement, testified that Mr. Popich told him he was not willing to do a credit sale after Mr. Harris had explained to him what it was. The Court asked Mr. Harris directly, "Basically, the reason was, the sole reason was to avoid potential litigation in case he didn't pay?" Mr. Harris responded "Yes, sir." Mr. Harris denied ever telling Mr. Vekic that he was entitled to damages or likening the agreement to the

credit sale of a vehicle. However, Mr. Harris did agree that the subject damages, though not of this magnitude, were contemplated by the agreement.[6]

Finally, Mr. Popich himself testified, stating that he told Mr. Vekic that he would not sell the three leases for less than $90,000. He also said, "Little Nicky call[ed] me [to ask] if I sublease it… who's going to have damage. I told him you could have damage because I'll--(unintelligible). … Then he sa[id] okay, that we finished with that." Mr. Popich also testified that he contemplated possible damage for pipeline digging but never anything like the BP spill.

> The trial court explained orally to counsel for the Popich family that,
>
> My reasoning in this whole case, ruling as I did, was the parties didn't contemplate this issue. But like I just reiterated, the only thing [the Popich family] expected was the $90,000 to be paid over the three-year period and that was it and everything—the lease was going to go to [Mr. Vekic].[7]

We agree that the agreement between the parties, when reviewed as a whole and in light of the parties' testimony, evidences the parties' intent that payment of $90,000 rent (but no more, except in the case of late payment or default) to the Popich family be insured in every possible circumstance. Rather than protecting their ability to claim property damages against third parties, the Popich family's attorney crafted an

---

[6] Q. All right. So the way you're interpreting, the way you understand it now, okay, and I know nobody thought about the BP spill, but we did think about the possibility of damages to the leases?
A. Correct.
Q. Thought that could happen?
A. Correct.
Q. We didn't think that there would be damages perhaps of this magnitude?
A. No sir, not 10 time the value. I don't think anybody contemplated that.

[7] It is not clear whether the trial court agreed with Mr. Vekic's assertion that the agreement was a disguised credit sale; however, the following comment appears to show that it did: "The intention of the parties in my opinion—even though they didn't anticipate the BP spill—was that your client was going to get $90,000 over the course of three years. No more. No less. If there's any damages occurring to these **leases that they bought**, they suffer. They're due the damage. If there's any money obtained from the lawsuit due to damage to the lease, they get it." (Emphasis added.) When the Popich family's attorney responds, "I don't see that anywhere in the contract," the trial court replies, "It's not in the contract. But they suffer it. That's the bottom line."

agreement which actually **requires** that Mr. Vekic "adjust" claims for property damages.[8] Here, BP agreed to settle claims for property damage to oyster leases in order to avoid trial, and the Popich family settled a claim which was clearly Mr. Vekic's to adjust under the agreement. Although the Popich family asserts that the term "adjust," which is not defined within the agreement, does not encompass "settling" or "releasing" claims as the Popich family did with the BP claim, we find this argument unavailing. The first definition of the term "adjust" in Merriam-Webster's dictionary is as follows:

> 1. a. to bring to a more satisfactory state … :**SETTLE, RESOLVE** – <orderly ways of [adjusting] conflicts> :RECTIFY <[adjusting] the error>.[9]

Settlement of a claim is within the plain meaning of the word "adjust" in this context.

The Popich family relies heavily on the fact that Mr. Vekic has not proved actual damages, that Mr. Vekic's claim as an oyster leaseholder of the subject property was denied by the DHECC, and that an award for property damages would amount to a windfall for Mr. Vekic.[10] However, our legal analysis does not hinge

---

[8] The Civil Code provides that, "In case of doubt that cannot otherwise be resolved, a provision in a contract must be interpreted against the party who furnished its text." La.Civ.Code art. 2056. It is undisputed that the Popich family's counsel furnished the text of the agreement at issue in this case. However, the agreement contains a provision that "[t]he parties expressly agree that this Agreement resulted from the effort of both parties…. Therefore, this Agreement shall be construed neither against nor in favor of either party.…" We need not determine the enforceability of this provision, because the agreement and extrinsic evidence supports the trial court's findings regarding the intent of the parties.

[9] *Adjust,* Webster's Third New Int'l Dictionary (2002)(emphasis added).

[10] We note that the record does contain evidence of potential damages to the leases due to the oil spill, although this finding is not necessary for our determination that Mr. Vekic is entitled to the damage proceeds at issue. In the trial in the present case, the parties presented opposing oyster biologist experts. The Popich family's expert minimized any possible damage to the leases at issue. However, Mr. Vekic's expert, Dr. Edwin Cake, testified that dispersed oil—oil which had been sprayed by the dispersant, Corexit, and sunk into the water column rather than remaining on the surface—affected oyster populations. Oyster fishermen place cultch, i.e., hard substrate in the form of rock, concrete, or shells, to provide a place for seed oysters, or spat, to attach and grow into adults. Dr. Cake testified that it was his opinion "that the cultch material in the area that existed before the spill or existed at the time of the spill had been impacted by the dispersed oil… in this case, it affects the ability of spat to settle on cultch materials that have been impacted by the dispersed oil." Dr. Cake also noted that oyster larvae in the water column at the time of the spill could be affected by the dispersed oil, not being able to close up the way that adult, shelled

12

on Mr. Vekic's ability to prove his property damage claim against BP was meritorious. The matter before us is one of contractual interpretation to determine the agreed-upon allocation of rights and obligations between the parties. Our role is not to litigate claims of BP's tortious conduct or to interpret the terms of the BP settlement; rather, our duty herein is to determine which party is entitled to bring those claims under the agreement at issue. The DHECC's denial of Mr. Vekic's claim as leaseholder of the subject property is not relevant *vis-à-vis* the parties to this agreement.

Likewise, proof of actual damages is not required in order for this Court to determine that claims for such damages beyond the $90,000 due to the Popich family in rent belong to Mr. Vekic under the agreement between the parties. Nevertheless, we note that the plaintiff class in the suit against BP had been preparing studies and gathering experts in anticipation of a trial to prove damages to the oyster leases, and it is clear that the BP compensation plan for the "oyster leaseholders" was intended to avoid any such trial. As Judge Barbier stated in his reasons for approving the settlement agreement with BP, "oyster leaseholders are being compensated in the [Oyster Compensation Fund], in part, for out-of-pocket funds to re-cultch or otherwise tend to oyster lease beds, and additional compensation reflects that oyster

---

oysters can. He also stated that during his examination of Mr. Vekic's leases, he "found oysters only growing on areas where Mr. Vekic had planted new cultch material."

For his part, Mr. Vekic testified that before the spill he had planted a relatively small amount of concrete on the leases. When the lease grounds reopened after the spill, he placed roughly 3000 tons of rock and 2000 yards of oyster shells on the lease, costing roughly $250,000. He stated that, after the spill "you could see the difference. You could see slime on the reefs. You could see reefs that were producing before aren't as time went on. You're not seeing the spawn…. If you didn't put any cultch material after the oil spill, you [were] pretty much done."

However, Mr. Vekic's counsel also testified "Actual loss relating to the bedding, we concede, he had no actual loss. He bedded no oysters." However, losses related to bedding of oysters are not the only potential damage to the leases. As described above, dispersed oil in the water column can affect any reefs or cultch already in existence as well as the general health of the oyster population in the area.

landings are returning to pre-spill levels more slowly than other species." *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 958 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Ho*rizon, 739 F.3d 790 (5th Cir. 2014).

Finally, the Court of Appeal found that Mr. Vekic was precluded from entitlement to property damages through its erroneous application of the "subsequent purchaser doctrine" as articulated by this Court in *Eagle Pipe*, 79 So.3d at 256-57, where we explained:

> [A]n owner of property has no right or actual interest in recovery from a third party for damage which was inflicted on the property before his purchase in the absence of an assignment or subrogation of the rights belong to the owner of the property when the damage was inflicted.

We find that *Eagle Pipe* and the jurisprudentially-developed "subsequent purchaser doctrine" do not apply here because, **before the damage at issue occurred,** the Popich family **assigned to Mr. Vekic** the express right (and indeed duty) to adjust "claims for damage to or destruction of any portion of the subleased property." With this language, the Popich family specifically contracted away its right to adjust damage claims on the subleased property, reserving only payment of advance rent. Therefore, at the time of the BP spill, the Popich family did not have any right—other than to join with Mr. Vekic to ensure it was paid the full amount in rent—to settle the claims for property damages. This is not a typical purchase of immovable property,[11] as the parties in this case had contemplated that Mr. Vekic would adjust the property damages at issue (although the parties had not anticipated the damages would be in such a large amount) before the damages were incurred. In

---

[11] Oyster leases are considered incorporeal immovable property pursuant to La.Civ.Code art. 470.

fact, the seminal Louisiana case annunciating the "subsequent purchaser doctrine" stated:

> It is true, that the purchaser of property is presumed to purchase all actions appurtenant to the property, and necessary to its perfect enjoyment**; but as to damages actually suffered before the purchase**, we know of no other principles governing the case than those referable to this general provision of the code, that every act of man that causes damage to another obliges him by whose fault it happened to repair it. It is a mere corollary, **that the reparation must be made to him who suffered the injury.**

*Clark v. Warner*, 6 La.Ann. 408, 409 (1851) (emphasis added).

In other words, the Court found that the personal right of action that arises for property damage belongs to the owner **because** the owner is the one who suffers the damage at the time it is caused. Here, though the Popich family was technically the leaseholder of record in the Department of Wildlife and Fisheries at the time of the spill, it had already washed its hands of all risk and responsibility related to the oyster leases in return for $90,000 in a contract which could not under any circumstances be terminated by Mr. Vekic. Thus, the "subsequent purchaser doctrine," as developed and articulated in jurisprudence from *Clark* to *Eagle Pipe*, does not apply in this case. Furthermore, *Eagle Pipe* is factually distinguishable, as it involved a suit against a third party for contamination of property. In contrast, the matter before us is a declaratory judgment between the parties of an agreement in which one party (Mr. Vekic) seeks **enforcement** of that agreement.

The Court of Appeal correctly notes that the 2011 Act of Sale contained no express assignment of personal rights; however, none was required. Section 17 of the original agreement between the parties provides:

> **Waiver and Amendment.** No provisions of this Agreement shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.

The 2011 Act of Sale did not unambiguously waive or amend Section 9 of the 2009 agreement.

"When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, **but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.**" La.Civ.Code art. 2054 (emphasis added). At the heart of this matter is the unique and troublesome form of contract confected by the parties: a "Sublease with Option to Purchase" which shifts all risk to the "lessee," requires him to pay rent under any circumstance and even in the event of the "lessor's" default, requires him to adjust "[c]laims for damages to or destruction of any portion of the subleased property," and provides that he can exercise his option to purchase without paying **any additional consideration beyond the required $90,000 in rent.**[12] Thus, there is little precedent to serve as a guide in interpreting the intent of the parties in a "contract of that kind," as contemplated by La.Civ.Code art. 2054. However, the record reflects that Mr. Popich gave up the leases at issue upon his retirement from the oyster business. A year before the spill, Mr. Vekic assumed responsibility for these leases. He has now formally purchased them. Oyster farming is a long term endeavor which requires significant investment in improving the quality of the waterbottoms. As shown above, the BP oyster compensation plan for leaseholders was intended to settle claims for damages to waterbottoms. The agreement at issue transferred all responsibility and risk regarding the leases at issue to Mr. Vekic at the time of signing. The Civil Code article from which Louisiana tort law is derived states that "[e]very act whatever of man that causes damage to another obliges him

---

[12] Because we find that interpretation of the terms of the agreement entitles Mr. Vekic to the damage proceeds, the issue of whether the agreement was a disguised credit sale is pretermitted.

by whose fault it happened to repair it." La.Civ.Code art. 2315(A). As this Court stated in *Clark,* "it is a mere corollary [to La.Civ.Code art. 2315] that the reparation must be made to him who suffered the injury." 6 La.Ann. at 409. In this case, that person is Mr. Vekic.

Finally, Mr. Vekic argues that it was inappropriate to award Mrs. Harris a 10% contingency fee for the first two payments of settlement proceeds along with costs for filing property damage claims with the DHECC. We find the trial court committed no manifest error in finding that Mrs. Harris was entitled to this award.

## DECREE

For the foregoing reasons, we reverse the Court of Appeal's decision and reinstate the trial court's judgment. **REVERSED.**

**SUPREME COURT OF LOUISIANA**

**NO. 2017-C-0698**

**NIKOLA P. VEKIC**

**VERSUS**

**DRAGUTIN POPICH, MARY A. POPICH,
AND HELEN HARRIS POPICH**

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ST. BERNARD*

**WEIMER, J.**, concurring in part and dissenting in part.

I agree with my learned colleagues that this dispute is governed by the "unique and troublesome" agreement confected between these parties. See **Vekic v. Popich**, 17-0698, slip op. at 16 (La. 10/18/17). This matter also presents in a unique posture regarding the ultimate remedy, which the majority acknowledges is guided by no precedent. *Id.* This agreement has defied being pigeonholed with even the parties sometimes offering different analyses. See *id.* at 6 n.2. Whether the agreement is a disguised credit sale,[1] a lease, or something else, it would be fair to say the agreement is *sui generis*.

Ultimately, the parties are bound by the agreement. The majority reverses the court of appeal, but both decisions impose a "winner-take-all" solution. However, in my view, the agreement offers a different resolution:

> Lessee shall have the right to proceeds derived from such claims in an amount sufficient to reimburse Lessee for Lessee's actual loss (i.e., the cost of bedding oysters in the damaged area); proceeds in excess of such reimbursed amount shall be received by Lessor as advance Rent.

---

[1] See **Vekic**, slip op. at 16 n.12.

**Vekic**, slip op. at 3. This provision indicates the Lessee (Mr. Vekic) is entitled "to proceeds derived from ... claims," but with a limitation. The limitation is "an amount sufficient to reimburse" him for "actual loss (i.e., the cost of bedding oysters in the damaged area)." *Id.* Any amount in excess of what the Lessee proves as "actual loss," is to be received as advance rent by the Popiches. *Id.* Although the lease elsewhere indicates the rent is $90,000, this provision limits Mr. Vekic to "actual damages." *Id.*

The simple fact is that neither party, in confecting this agreement, considered the potential "windfall" resulting from the settlement with BP. The majority acknowledges "the agreement does not expressly provide that the excess damages would go to Mr. Vekic." **Vekic**, slip op. at 6. I agree the parties to the agreement never considered the situation which arose–that the settlement may be in excess of the $90,000 and potentially in excess of Mr. Vekic's "actual loss." However, the agreement does, by its terms, expressly limits Mr. Vekic to "actual loss" with the "excess of such reimbursed amount" going to the Popiches. See *id.* at 3.

I cannot overlook the efforts of the Popiches to procure the settlement. As the majority notes, when the Popiches filed the claim, they notified the Deepwater Horizon Economic Claim Center of the 2009 Agreement with Mr. Vekic and the post-spill Act of Sale. Significantly, Mr. Vekic filed his own claim, but was denied. Instead of pursuing the claim further, he abandoned his claim and sued the Popiches. This is despite the fact a separate claim opportunity for sublessees like Mr. Vekic was created.

Respectfully, the majority automatically equates the amount of the settlement with the amount of damages Mr. Vekic sustained. However, the agreement limits Mr. Vekic's right to an amount sufficient to reimburse him for his "actual loss." See

2

**Vekic**, slip op. at 3. Furthermore, settlements can be, but are not necessarily, tethered to actual damages. Particularly here, the Popiches were not obligated to prove damages, but were paid a fixed amount of $2,000 per acre regardless of the amount of provable damages simply because they held a lease with the state at the time of the spill. This amount was paid despite the fact a sublessee's claim was also reserved and available to Mr. Vekic.

Parties settle for many and various reasons: because of a desire to avoid or limit protracted litigation, out of a sense of moral obligation, in an effort to build good will, or to mitigate other damages or future loss of profits.

As the majority notes, counsel for Mr. Vekic conceded there was "no actual loss. He bedded no oysters." **Vekic**, slip op. at 12-13 n.10. However, there was testimony by Mr. Vekic that he spent approximately $250,000 on rock and oyster shells after the spill to provide cultch on the property so as to remediate the oyster lease. *Id.*

The majority properly indicates "there is little precedent to serve as a guide" in this unique matter. *Id.* at 16. Each side sought a windfall from BP. The Popiches succeeded in the BP claim process; Mr. Vekic did not. In effect, the majority is not only rendering a judgment, but awarding specific funds against which the judgment can be executed, which may or may not reflect the "actual loss" limitation in the contract. See **Vekic**, slip op. at 3.

The majority properly cites La. C.C. art. 2054, which provides:

> When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.

3

**Vekic**, slip op. at 6. As indicated, the majority also properly acknowledges this matter involves a "unique and troublesome form of contract confected by the parties." *Id.* at 16. I agree with the majority that "the BP oyster compensation plan for leaseholders was intended to settle claims for damages to waterbottoms" so as to restore the state lands to productivity. *Id.* I acknowledge many equities lie with Mr. Vekic because, as to this tract, he is incentivized to return the property owned by the state to oyster productivity. As to this tract, the Popiches have no incentive to make this tract productive. There is no obligation for the Popiches to remediate. However, I respectfully disagree with my colleagues in the majority that the agreement provides Mr. Vekic with a right to a portion of the BP claim sufficient to reimburse him beyond his "actual loss." See **Vekic**, slip op. at 3. I believe Mr. Vekic's loss includes the cost to cultch or recultch the oyster beds and to bed the oysters in the damaged area and any other provable "actual loss." *Id.* This may or may not consume the entire amount of the BP settlement procured by the Popiches. If it does not, since the Popiches have already received the entire rental amount from Mr. Vekic, the trial judge should divide the balance of the proceeds according to "law, equity, or usage"[2] because this agreement did not provide for the settlement windfall the Popiches orchestrated for the mutual benefit of these parties.

---

[2] La. C.C. art. 2054.

4